# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **ALLIED ERECTING AND** | ) | **CASE NO.  4:06CV114** |
| **DISMANTLING CO., INC. and** | ) | |
| **ALLIED-GATOR, INC.,** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GENESIS EQUIPMENT &** | ) | **MEMORANDUM OPINION** |
| **MANUFACTURING, INC.,** | ) | **AND ORDER** |
| **PALADIN BRANDS, LLC, and** | ) | |
| **MARK RAMUN** | ) | |
| | ) | |
| **Defendants.** | ) | |

The instant matter is before the Court on Defendant Mark D. Ramun's Motion for Summary Judgment (Dkt. # 111), and Defendants Genesis Equipment & Manufacturing, Inc. ("Genesis") and Paladin Brands, LLC's ("Paladin") (collectively "Defendants") Motion for Summary Judgment (Dkt. # 112).  For the following reasons, Defendants' Motions are GRANTED IN PART.

## I. FACTUAL BACKGROUND

### A. The Parties

Plaintiff Allied Erecting and Dismantling Co., Inc.  ("Allied Erecting") is an industrial dismantling contractor and its sister company, Plaintiff Allied-Gator, Inc. ("Allied-Gator") (collectively "Allied") is a manufacturer of specialized equipment and attachments for the dismantling and scrap processing industries.  (Dkt. # 129, at 1.)  Both Allied Erecting and Allied-Gator are wholly-owned subsidiaries of Allied Consolidated

1

Industries.  (Dkt. # 129, at 1.)  John Ramun, Allied's President, and his father founded the company over thirty years ago in Youngstown, Ohio; it has remained family-owned and family-operated.  (Dkt. # 129, at 1.)

Founded in 1997, Defendant Genesis designs and manufactures attachments—including industrial shears and concrete pulverizers—for the demolition, scrap-processing, and reconstruction industries.  (Dkt. # 112, at 3.)  In June 2004, the assets of Genesis were sold.  (Dkt. # 112, at 3.)  Since selling off its assets, Genesis has not been an operating entity; Genesis Attachments, LLC has been operating the Genesis business.  (Dkt. # 112, at 3–4.)  However, Genesis Attachments, LLC is not a party to this lawsuit.  (Dkt. # 112, at 3.)

Defendant Paladin was the parent company of Genesis Attachments, LLC until August 30, 2006, at which time the assets of Paladin (including Genesis Attachments, LLC) were sold to a new owner.  (Dkt. # 112, at 3.)

Defendant Mark Ramun is the son of John Ramun.  (Dkt. # 112, at 3.)  From May 1992 to June 2001, Mark Ramun was a full-time employee of Allied.  (Dkt. # 129, at 4.)  During his tenure with Allied, Mark Ramun worked as the manager of information systems, manager of projects and administration for Allied Erecting, and manager of marketing for Allied-Gator.  (Dkt. # 129, at 4.)  In August 2003, Mark Ramun began working for Genesis.  (Dkt. # 112, at 3.)

**B. The Products**

There are two primary products at issue in this dispute: (1) the Allied MT and (2) the Genesis LXP.

2

### 1. The Allied MT Series Multi-Tool

The Allied MT is a multi-purpose attachment designed to meet the special requirements of the demolition industry: speed, versatility, durability, and power. (Dkt. # 129, at 2.) The Allied MT "generates the power of a dedicated tool (a tool which does not permit multiple jaw sets), with the versatility of a multi-purpose tool, permitting an operator to field change from a shear jaw set (which cuts steel) to a concrete-crusher jaw set (or other MT jaw set) in a matter of minutes." (Dkt. # 129, at 2.)

John Ramun first conceived of the MT in 1995; the first MT was put into service in October 2000. (Dkt. # 129, at 3.) Allied claims to have spent several million dollars in designing, testing, and developing the Allied MT. (Dkt. # 129, at 2.) By 2004, Allied had sold only 4 MT's. (Dkt. # 129, at 3.) However, since then, sales of the Allied MT have increased. (Dkt. # 129, at 4.) To date, Allied has sold 77 MT's, and is currently manufacturing over 151 to supply future orders. (Dkt. # 129, at 4.)

### 2. Genesis LXP

Genesis manufactures a variety of heavy attachments for the demolition and scrap industries. (Dkt. # 112, at 4.) The LXP is designed to be attached to an excavator and used to shear steel. (Dkt. # 112, at 4.) It is similar to Allied's MT in that it can accommodate interchangeable jaw sets. (Dkt. # 112, at 4.) The LXP can be used with either a shear jaw set, concrete-pulverizer jaw set, or cracker jaw set. (Dkt. # 112, at 4.)

Defendants claim that, although multi-processors with interchangeable jaw sets have been around for a number of years, Genesis's LXP product is unique in that it relies on a hydraulically expandable lock pin and a quick coupler pin to lock the jaw set to the

body of the attachment.  (Dkt. # 112, at 4.)  Defendants also claim that the Allied MT differs from the LXP because, rather than employing a hydraulically expandable lock pin, the MT requires manual insertion of several keeper pins to attach the jaw set to the body of the tool.  (Dkt. # 112, at 5.)

### C. Mark Ramun's Access to Allied's Confidential Information

Mark Ramun served as a full-time employee of Allied from May 1992 to June 2001.  (Dkt. # 129, at 4.)  During that time, Mark Ramun worked for both Allied Erecting (as manager of projects and administration), and Allied-Gator (as manager of marketing).  (Dkt. # 129, at 4.)  In these capacities, Mark Ramun had network access to documents and confidential information relating to Allied's contracts, accounting, payroll, and financial data.  (Dkt. # 129, at 4.)

Moreover, Mark Ramun had the highest security clearance at Allied and, therefore, had access to all computer files relating to design, engineering, sales, and marketing.  (Dkt. # 129, at 4.)  Mark Ramun's access included access to the confidential engineering information used in the development of the Allied MT.  (Dkt. # 129, at 4.)  Mark Ramun signed an employment agreement, which prohibited him from, inter alia, disclosing Allied Erecting's confidential or trade-secret information to third parties or competitors.[1]  (Dkt. # 129, at 5.)

### D. Mark Ramun's Alleged Misappropriation of Trade Secrets

After resigning from his employment with Allied, Mark Ramun retained nearly 15,000 documents.  (Dkt. # 129, at 7.)  Allied alleges that these documents contained "a

---

[1] The employment agreement expressly states that it is "by and between" Mark Ramun and Allied Erecting.

substantial array of highly confidential and proprietary information . . . . [including] the master presentations that mark Ramun used to make numerous tailored presentations to each of the prospective joint venture partners [who were] desiring not only to learn more about Allied's products and ideas, but also [to] potentially manufacture Allied's line of attachments."  (Dkt. # 129, at 7.)  Responding to Allied's Complaint, Mark Ramun initially denied that he had retained any of Allied's confidential information.  (Dkt. # 129, at 7.)  Subsequently however, Mark Ramun admitted that he had retained Allied's confidential files and documents, and provided Allied with 5 CDs and 2 DVDs containing the nearly 15,000 documents that he retained from Allied.  (Dkt. # 129, at 7.)

Moreover, a forensic computer analysis of Mark Ramun's laptop revealed that he had installed commercial software on his computer that allowed him to permanently delete information from his laptop.  (Dkt. # 129, at 8.)  Mark Ramun installed this software on February 19, 2006, shortly after Allied filed its Complaint.  (Dkt. # 129, at 8.)  The last run date for this deletion software was on June 27, 2006, immediately prior to the date in early July 2006 when Mark Ramun surrendered his laptop to his own counsel, Brian Hall, to be quarantined and forensically analyzed.  (Dkt. # 129, at 8–9.)

### E. A-Ward Attachments

Following his employment with Allied, Mark Ramun worked for A-Ward Attachments ("A-Ward") from September 2002 to August 2003.  (Dkt. # 129, at 8.)  A-Ward manufactures mechanical tools and attachments for the demolition, recycling, and material-handling industries.  (Dkt. # 129, at 8.)  The President of A-Ward, Simon Ward ("Ward"), testified during his deposition that Mark Ramun attempted to show Ward

5

confidential information regarding the Allied MT, which was taken from a presentation that Mark Ramun had done for Allied-Gator in Europe.  (Dkt. # 129, at 8; Ward Dep. 59:16–84:22.)  Ward refused Mark Ramun's offer.  (Dkt. # 29, at 8; Ward Dep. 62:7–15.)  Mark Ramun eventually resigned from A-Ward.  (Dkt. # 129, at 8.)  Subsequently, A-Ward filed suit against Mark Ramun for disclosing confidential information to his next employer, Genesis.  (Dkt. # 129, at 8; Grieco Decl. Ex. H, A-Ward Complaint against Mark Ramun.)

### F. Genesis

After making a presentation to Genesis about A-Ward products, Mark Ramun joined Genesis as an employee in August 2003.  (Dkt. # 129, at 9.)  Bruce Bacon ("Bacon"), the Vice President and General Manager of Genesis, personally hired Mark Ramun.  (Dkt. # 129, at 11.)  In an employment-proposal letter from Bacon to Mark Ramun, Bacon made it clear that Mark Ramun was being "groom[ed] . . . for the top slot" at Genesis.  (Dkt. # 129, at 11; Grieco Decl. Ex. V.)

The letter outlined three phases to Mark Ramun's employment with Genesis.  (Grieco Decl. Ex. V.)  In phase one, Mark Ramun's initial title would be "Special Projects Director," and his responsibilities would include: (1) input into the launch of and design of a new product line, and (2) direct sales to customers and distributors.  (Grieco Decl. Ex. V.)  In phase two, Mark Ramun would become a regional manager; he would continue to have direct input into new product development.  (Grieco Decl. Ex. V.)  Bacon characterized phase three as Mark Ramun's "managerial 'rise-to-the-top'" phase, during which Mark Ramun would "learn all phases of how [Genesis] operates, including:

6

planning, financial controls, production, traffic, legal, international, human resources, marketing, etc." (Grieco Decl. Ex. V.)

Moreover, Bacon's proposal offered, and Mark Ramun's Employment Agreement ultimately secured, extraordinary incentives.  For instance, Mark Ramun received not just the standard 2.5% commission on sales in his territory, but also "1% of all revenue generated company-wide" on the product line Mark Ramun would develop.  (Dkt. # 129, at 12; Grieco Decl. Ex. CC.)  Additionally, in the event that Genesis sold a majority of its stock and the new ownership elected not to retain Mark Ramun at Genesis—or elected not to retain him in a position that was at least equal to his position when such sale occurred—Mark Ramun was slated to receive a one-time lump-sum payment of $50,000. (Dkt. # 129, at 12; Grieco Decl. Ex. CC.)

Mark Ramun first joined Genesis as a sales manager and product specialist.  (Mark Ramun Dep. 38:1, Feb. 9, 2007.)  As a sales manager, his responsibilities included selling and representing Genesis products in Ohio, Indiana, Kentucky, and the City of Chicago. (Mark Ramun Dep. 38:5–10, Feb. 9, 2007.)  As a product specialist his duties included "assist[ing] in the training and sales of the mechanical line of tools that Genesis made nationwide."  (Mark Ramun Dep. 38:13–15, Feb. 9, 2007.)  Mark Ramun was also involved with designing and developing products for Genesis.  (Mark Ramun Dep. 38:20–23, Feb. 9, 2007.)

Within one year of joining Genesis, Mark Ramun was promoted to director of product development and director of demolition services.  (Grieco Decl. Exs. DD, EE.) In these new roles, Mark Ramun was responsible for developing a business plan and

products to grow Genesis's business in the demolition sector.  (Mark Ramun Dep. 68:21–69:4, Feb. 9, 2007.)  As additional compensation, Mark received a percentage (one-third of one percent) of all new attachment sales, including the LXP.  (Mark Ramun Dep. 69:5–8.)

Mark Ramun ultimately formulated a business plan for Genesis entitled "Demolition Services Group Internal Business Plan."  (Grieco Decl. Ex. GG.)  The business plan outlined the strategy and products that Mark Ramun believed Genesis needed to implement to successfully penetrate the demolition market.  The recommended products included a universal multi-processor (allegedly meant to mirror Allied's MT line), miniature shears (allegedly meant to mirror Allied's MT 10), and a demolition bucket (allegedly meant to mirror Allied's Demo Bucket).  (Grieco Decl. Ex. GG; Dkt # 129, at 12.)

Genesis claims that, while Mark Ramun was charged with expanding Genesis's sales to the demolition market, he was not responsible for product design development.  (Dkt. # 112, at 4.)  However, it appears that, in helping to implement his business plan, Mark Ramun worked with Genesis engineers, providing design input for the planned demolition products.  (Grieco Decl. Exs. HH, II, JJ, KK, LL, MM, NN, FFF.)  In particular, it appears that Mark Ramun was involved in the design and development of the Genesis LXP.  (Letko Dep. 59:13–23; Mark Ramun Dep. 89:1–16, Feb. 9, 2007; Grieco Decl. Ex. Y.)  Moreover, while Genesis has claimed that the LXP was under design development before it hired Mark Ramun, it appears that the development of the

8

LXP began with the implementation of Mark Ramun's business plan.  (Dkt. # 129, at 14–16.)

## II. PROCEDURAL HISTORY

On January 17, 2006, Allied filed its ten-count Complaint against Genesis, Paladin, and Mark Ramun.  (Dkt. # 1.)  On October 3, 2008, Genesis and Paladin filed its Motion for Summary Judgment with Respect to Counts II, IV, V, VIII, IX, and X.  (Dkt. # 112.)  On October 5, 2008, Mark Ramun filed his Motion for Summary Judgment on Counts I, III, and VII.  (Dkt. # 111.)

## III. LAW AND ANALYSIS

Allied's Complaint alleges seven causes of action against Genesis and Paladin, and three causes of action against Mark Ramun:

Against Genesis and Paladin-

Count Two: Tortious Interference with Contract.

Count Four: Conspiracy to Breach Fiduciary Obligation.

Count Five: Violation of the Lanham Act.

Count Six: Violation of the Ohio Deceptive Trade Practices Act.

Count Eight: Violation of the Uniform Trade Secrets Act.

Count Nine: Commercial Disparagement.

Count Ten: Violation of the Patent Mismarking Act.

Against Mark Ramun-

Count One: Breach of Employment Contract.

9

<u>Count Three</u>: Breach of Fiduciary Obligation.

<u>Count Seven</u>: Violation of the Uniform Trade Secrets Act.

Genesis, Paladin, and Mark Ramun seek summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  For the reasons that follow, Genesis and Paladin's Motion for Summary Judgment (Dkt. # 112) and Mark Ramun's Motion for Summary Judgment (Dkt. # 111) are each GRANTED IN PART as follows: as to Counts I, II, III, IV, V, VI, IX, and X, Summary Judgment is GRANTED; as to Counts VII and VIII, Summary Judgment is DENIED.

**A.  Summary Judgment Standard of Review**

Rule 56 governs motions for summary judgment and provides: "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."

The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying the evidence which it believes demonstrates "the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986).  The moving party's burden may be met by pointing out to the district court that there is an absence of evidence to support an essential element of the nonmoving party's case.  <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing <u>Celotex</u>, 477 U.S. 317, 325).

As for the nonmoving party's obligation, Rule 56(e) states: "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading."  Rather, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)(2)).  The non-moving party must show more than a scintilla of evidence to overcome summary judgment; in other words, "there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 560 (6th Cir. 2004).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  Anderson v. liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must not grant summary judgment "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

### B. Uniform Trade Secrets Act (Counts VII and VIII)

Allied alleges Uniform-Trade-Secret-Act claims against Mark Ramun (Count VII) and Genesis and Paladin (Count VIII).  Allied asserts that Defendant Mark Ramun—"[i]n

11

failing to return . . . highly confidential documentation upon the termination of his employment, and in disclosing it to Genesis"—misappropriated its trade secrets in violation of Ohio's Uniform Trade Secret Act ("UTSA"), Ohio Revised Code § 1333.61, *et seq*.  (Compl. ¶ 60.)  Allied further alleges that Defendants Genesis and Paladin also misappropriated its trade secrets because they "knew, or had reason to know, that this information: [1] constituted a 'trade secret'; [2] was not knowledge that was general in the trade or to the public; [3] was acquired by Ramun by improper means . . .and/or [4] was disclosed without the express or implied consent of [Allied].  (Compl. ¶ 63.)

Defendants argue that they are entitled to summary judgment on Allied's trade-secret-misappropriation claims because Allied has "failed to specifically identify information that constitutes a trade secret within the meaning of Ohio's UTSA or as ordered by this Court."  (Dkt. #112, at 15.)

For the reasons that follow, the Court DENIES Defendants' Motions for Summary Judgment with respect to Allied's UTSA claims.

### 1.  Ohio UTSA

In order to prevail on its misappropriation-of-trade-secret claims, Allied "must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; (3) the unauthorized use of a trade secret."  Heartland Home Fin., Inc. v. Allied Home Mortgage Capital Corp., 258 Fed. Appx. 860, 861 (6th Cir. 2008) (citing Hoover Transpl. Servs. v. Frye, 77 Fed. Appx. 776, 782 (6th Cir. 2003) (per curiam)).  Ohio's UTSA defines a "trade secret" as:

(D) [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D).  The Supreme Court of Ohio has adopted six factors for consideration in determining whether an item constitutes a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

State ex. rel. Plain Dealer v. Ohio Dep't of Ins., 687 N.E.2d 661, 672 (Ohio 1997).  No single factor in the Plain Dealer trade-secret analysis is dispositive.  Heartland Home Fin., Inc. v. Allied Home Mortgage Capital Corp., 258 Fed. Appx. 860, 862 (6th Cir. 2008).  However, both the Ohio Supreme Court and the Sixth Circuit have emphasized that "a business or possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status" because "once

13

material has been publicly disclosed, it loses any status it ever had as a trade secret."  Id.

(citing State ex. rel. Rea v. Ohio Dep't of Educ., 692 N.E.2d 596, 601 (Ohio 1998); State

ex. rel. Plain Dealer v. Ohio Dep't of Ins., 687 N.E.2d 661, 672 (Ohio 1997)).

> The statutory definition of "misappropriation" includes any of the following:
>
>> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
>>
>> (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
>>
>>> (a) Used improper means to acquire knowledge of the trade secret;
>>>
>>> (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Ohio Rev. Code § 1333.61(B).

## 2. Defendants' Joint Motion *In Limine*

As a preliminary matter, the Court must first address the issues and arguments that

the Defendants raise in their Joint Motion *In Limine* to Strike Expert Report and Preclude

Testimony of Ron Karani (Dkt. # 120); arguments which, to some extent, the Defendants

reiterate in their Motions for Summary Judgment.  Defendants essentially make two

arguments: (1) that Kanani's report should be stricken pursuant to Rule 37 of the Federal

Rules of Civil Procedure, and (2) that Karani's report should be stricken based on Rule 702 of the Federal Rules of Evidence and <u>Daubert</u> principles.  (Dkt. # 120.)

As to the first argument, which the Defendants repeat in their Motions for Summary Judgment, Defendants assert that "[b]ecause each of these alleged trade secrets were [sic] not identified and properly disclosed with specificity in response to this Court's January 7 Order, Allied's claims with respect thereto should be dismissed."  As explained in the Court's accompanying Order Denying Defendants' Motion *In Limine*, the Court finds that Allied properly disclosed its trade secrets in discovery and then elaborated upon them through its expert report.  Thus, to the extent that Defendants rely upon this argument in seeking summary judgment, the Court rejects it.

As to the second argument, and, again, as explained in the Court's accompanying Order, the Court denies Defendants' Motion *In Limine* as it pertains to Rule 702 and <u>Daubert</u> principles.   Therefore, the Court will consider Karani's expert report in addressing Defendants' Motions for Summary Judgment.

### 3. Disclosure: Allied MT Patents and Owner's Manuals

Defendants assert that Allied cannot identify any information that is appropriate for protection as a "trade secret" under the UTSA because Allied has specifically disclosed the information that it claims as trade secrets in (1) the Allied MT Patents and/or (2) the Allied MT Owner's Manual.

### *a*) Allied MT Patents

Defendants' disclosure argument with respect to the Allied MT Patents must fail for two reasons: (1) Allied may still retain trade-secret protection related to the Allied

15

MT, despite the fact that Allied holds a patent in the MT; and (2) Defendants have failed to demonstrate that they did, in fact, rely upon Allied's patents.

First, patent disclosure does not necessarily displace trade-secret protection.  See Milgrim on Trade Secrets § 1.06[1][b] (2007) ("The existence of a patent does not preclude trade secret protection in all respects. . . . Confidential business information, albeit related to a patented product, is also subject to trade secret protection quite independent of patent considerations.").  And while, as a general proposition, there is no trade-secret protection for secrets that are disclosed in a patent application, numerous courts have allowed trade-secret protection for processes or specifications related to the patented device that are not disclosed in the patent.  See, e.g., Bourns, Inc v. Raychem Corp., 331 F.3d 704, 707–709 (9th Cir. 2003); Henry Hope X-Ray Prods, Inc. v. Marron Carrel, Inc., 674 F.2d 1336, 1342 (9th Cir. 1982); Catalyst & Chem. Servs. v. Global Ground Support, 350 F. Supp. 2d 1, 9, 10 n.4 (D.D.C. 2004), aff'd without op., 173 Fed Appx. 825 (Fed. Cir. 2006).

Here, Genesis claims that figures 8 and 31 of the Allied Patents for the Allied MT are "strikingly similar" to GATOR 34, one of the documents contained on the misappropriated discs, which allegedly contains Allied's trade secrets.  (Dkt. # 112, at 18.)  According to Genesis, the figures in the patent represent a public disclosure of that which Allied claims as a trade secret.  However, Allied rejects this characterization:

> Contrary to Genesis['s] claims, Figures 8 and 31 from the MT patents are very different and much less specific than the cross-sectional view of the main pivot group of the Allied MT depicted on GATOR 34.  Gator 34 shows the main shaft design and the arrangement of the internal components of the

16

shaft in far more detail than Figures 8 and 31 of the patents. In addition and most importantly, Gator 34 is a fully scalable, precision drawing that shows the stack up and retention of shaft and bridge components. This drawing came directly from the joint venture presentations that were on the disks admitted[ly] . . . retained by Mark Ramun. . . . Consistent with Allied's position, Even Dan Jacobson, Genesis's chief engineer, admits that the general drawings contained in Genesis'[s] LXP patent do not disclose the detailed, confidential information shown in Genesis's internal drawings of its main pivot group.

(Dkt. # 129, at 40 (citations omitted).)  The Court finds that there remains a genuine issue of material fact as to whether Allied's patents disclose its trade secrets.  Therefore, it would be improper for the Court to resolve these highly technical matters at the summary judgment stage.

Second, absent a showing that Defendants did, in fact, rely on Allied's patents in developing its products, Defendants cannot avoid liability for misappropriation by claiming, post hoc, that Allied's patents disclose its trade secrets.  In Norbrook Laboratories Ltd v. G.C. Hanford Mfg. Co., 297 F. Supp. 2d 463, 486 (N.D.N.Y 2003), the defendant similarly claimed that it could have discerned the plaintiff's "*in situ* method of manufacture for an injectable PGP suspension" by examining the plaintiff's patents. The court rejected this argument:

For the court this is of small consequence because [the defendant] failed to demonstrate any reliance on the patents. The patents are merely a *post hoc* explanation for how [the defendant] might have developed an *in situ* method, but [the defendant] presented no evidence at the hearing to suggest that its own chemists ever reviewed the patents.

17

Id.  The court went on to cite a Second Circuit opinion, Franke v. Wiltschek, 209 F.2d 493, 495 (2d Cir. 1953): "'It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not . . . they gained it from plaintiffs via their confidential relationship.'" Norbrook, 297 F. Supp. 2d at 486 (citing Franke, 209 F.2d at 495).

The Sixth Circuit has endorsed the reasoning employed in Franke.  See Vitro Corp. of America v. Hall Chemical Co., 254 F.2d 787, 793 (6th Cir. 1958) (citing Franke, 209 F.2d at 495) ("It matters not that defendants could have gained their knowledge from a study of the expired patent . . . . The fact is that they did not.").  The Seventh Circuit has similarly held that a showing of reliance upon the patent is a prerequisite to a defense that a trade secret has been disclosed in a patent.  See Goldberg v. Medtronic, Inc., 686 F.2d 1219, 1227 (7th Cir. 1982) ("[T]he existence of public disclosures is relevant only so far as the defendant actually relied upon them, and . . . the burden of proving such innocent reliance is on the defendant. . . . [O]ne who . . . uses confidential information to the owner's detriment is liable despite the fact that the information could have been lawfully obtained."); Smith v. Dravo Corp., 203 F.2d 369, 375 (7th Cir. 1953).  The Fifth Circuit has also refused to countenance an argument that a trade secret was disclosed in a patent where defendant failed to demonstrate reliance upon the patent.  W.C. Phillips v. Frey, 20 F.3d 623, 628 (5th Cir. 1994) ("Nowhere do appellants allege that they used the patent instead of the plaintiffs' trade secret to formulate their manufacturing process.").

Here, Defendants have admitted that they did not review, consult, or rely upon any Allied patents in developing the LXP.  As Allied notes, "Ross Christenson, Steve Letko

18

and Dan Jacobson, the engineers at Genesis responsible for developing the LXP, all admitted that they never reviewed or consulted any Allied patent."  (Dkt. # 129, at 39.) Accordingly, the Court will not permit Defendants to avoid liability based upon the alleged disclosure of trade secrets in Allied's patents.  Nevertheless, the Court will address, in the analysis below, Defendants' substantive arguments regarding patent disclosure.

### *b*) Allied MT Owner's Manual

Defendants' disclosure argument with respect to the Allied MT Owner's Manual must fail because the Owner's Manual is a confidential document that is not publicly available.  In the manufacturing industry, manufacturers typically provide owner's manuals to customers to aid customers in the maintenance and repair of the products they have purchased.  (Dkt. # 129, at 41.)  Allied claims that a purchaser of the Allied MT is under a legal duty to maintain the confidentiality of the information set forth in the Owner's Manual.  The confidential drawings contained within Allied's Owner's Manual specifically state that "this drawing and all information thereon is the sole property of Allied.  It is loaned confidentially with the clear understanding that it will not be copied, will be returned upon request and will not be used directly or indirectly in any way detrimental to our interest."  (Dkt. # 129, at 41.)  Because the Allied MT Owner's Manual is not publicly disclosed, Defendants cannot avoid liability by alleging that the Owner's Manual discloses Allied's trade secrets.  Nevertheless, the Court will address, in the analysis below, Defendants' substantive arguments regarding whether the Allied MT Owner's Manual discloses Allied's alleged trade secrets.

19

### 4. Allied's Alleged Trade Secrets

Allied identifies as trade secrets the following: (1) five features of the main shaft assembly (pivot group) of the Allied MT (i.e., the "shrink fit" of the knife to the shaft; the one-piece extended shaft design; the usage and location of a thrust bearing; the manner in which the pivot group operates; and the way the shaft is retained); (2) Allied's business plan; and (3) Allied's engineering data, cost data, and production/scheduling information.

### *a*) The Shrink Fit of the Knife to the Shaft

Allied's expert, Ron Karani, identifies the shrink fit of the Allied MT's main pivot group as a trade secret that Defendants misappropriated. Defendants challenge Karani's assessment as flawed because (1) the use of an interference fit is disclosed in, or otherwise readily ascertainable from, the Allied MT patents and the Owner's Manual; and (2) the use of a shrink fit is readily ascertainable and fails to afford Allied any independent economic advantage because the use of such a fit is ubiquitous. (Dkt. # 112, at 20.)

Contrary to Defendants' assertions, the Allied MT patents and owners' manual do not appear to reveal the use of an interference or shrink fit. The drawings in the patent and Owner's Manuals do not reveal the absence of any bearing between the upper jaw and the shaft or keyway to lock the upper jaw to the shaft. Moreover, that a shrink fit is common in the manufacturing industry does not preclude it from being a protectable trade secret in the larger context of the Allied MT. Common or ordinary items can still be a trade secret where used in a new application, design, or process. See, e.g., Computer

20

Care v. Serv. Sys. Enters., Inc., 982 F.2d 1063, 1074 (7th Cir. 1992) ("'A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process design and operation of which in unique combination affords a competitive advantage and is a protectable trade secret.'"); Harbor Software v. Applied Sys., Inc., 887 F. Supp. 86, 90 (S.D.N.Y 1995) ("case law supports the proposition that the overall *design* of a software program may be protectable as a trade secret, even if the individual *components* of that program are common knowledge in the programming industry.").  Allied acknowledges that manufacturers of heavy attachments have employed shrink or interference fits on different applications in the past, however, it insists that "no company prior to Allied employed a shrink fit in connection with a dual-use heavy attachment that employed interchangeable jaw sets." (Dkt. #129, at 43.)

Based upon the evidence before the Court, there is at least a genuine issue of material fact as to whether the shrink fit of the knife to the shaft is a protectable trade secret.

### *b*) The One-Piece Extended Shaft Design

Karani identifies the one-piece extended shaft design of the Allied MT as a protectable trade secret that Defendants misappropriated.  The alleged trade secret here is the way the shaft is one piece and extends the entire length of the tool beyond the anvil and into the bridge housings.  (Karani Dep. 195:23–196:10.)  As Karani explained during his deposition, "The shaft is . . . made of one piece. . . . it's not hollow.  There's nothing running through it . . . . [and the shaft] goes beyond the anvil and also into the bridge

21

housings." (Karani Dep. 195:25–196:11.)  Defendants argue that this feature is disclosed in Allied's Owner's Manual.  (Dkt. # 112, at 21.)  Moreover, Defendants claim that the feature is readily ascertainable from Allied MT patents and from a visual inspection of the product itself.  (Dkt. # 112, at 21.)

Contrary to Defendants' assertions, Karani does not concede that the use of a one-piece shaft is disclosed in Allied's Owner's Manual.  Karani merely indicates that, at best, one can "speculate that it's one piece."  (Karani Dep. 197:2–3.)  It does not appear that the Owner's Manual discloses whether the design utilizes a one-piece shaft.  Nor does it seem apparent from Allied's patents.  And the parties dispute whether someone skilled in the art could ascertain that the design utilizes a one-piece shaft merely by observing the exterior of the tool.

Thus, based on the evidence, there is at least a genuine issue of material fact as to whether the one-piece extended shaft design of the Allied MT is a protectable trade secret.

### *c*) The Usage and Location of a Thrust Bearing

Karani identifies the usage and location of a thrust bearing as a protectable trade secret that Defendants misappropriated.  While admitting that thrust bearings, in general, may be "everyday stuff," Allied emphasizes Karani's assertion that "the specific location and use of a thrust bearing in the new application of a heavy duty dual use attachment that accepts multiple or interchangeable jaw sets [is] a trade secret."  (Dkt. # 129, at 44.)

Defendants argue that Allied's 1987 patent discloses the use of a thrust bearing in the pivot group of a shear.  (Dkt. # 112, at 22.)  Defendants also claim that the 1987

patent, the Allied MT patents, and Allied's Owner's Manual all disclose the specific location of the thrust washer in Allied's pivot group.  (Dkt. # 122, at 22.)

Regarding Allied's 1987 patent, Allied insists that this patent is for a dedicated shear and is much different than the main pivot group for the Allied MT; therefore, the use of a thrust bearing in this patent allegedly has nothing to do with the Allied MT.  (Dkt. # 129, at 44.)  Moreover, Allied claims that neither the Allied MT patents nor the Owner's Manual specify the location of the thrust washer or the thrust bearing.  (Dkt. # 129, at 44–45.)

Finally, Defendants argue that the purposes of Defendants' and Allied's thrust bearing are different (i.e., the Genesis thrust bearing does not carry a thrust load).  However, the opposing experts are in disagreement over this issue, consequently a factual issue remains that must await determination by the trier-of-fact.

In sum, based on the evidence, there is at least a genuine issue of material fact as to whether the usage and location of a thrust bearing is a protectable trade secret.

### *d*) The Manner in which the Pivot Group Operates

Karani identifies the manner in which the pivot group operates as a protectable trade secret that Defendants misappropriated.  Karani's testimony clarifies the alleged trade secret at issue: "[T]he way the pivot grouping is designed . . . allows the bearing areas to operate free and clear of dirt and debris. . . . [W]hen the jaws are removed, because the pivot group stays intact together, it—doesn't accumulate dirt and debris."  (Karani Dep. 208:25–209:8.)  Karani also cited as protectable trade secrets the "sealing arrangement" (i.e., the use and location of "O-ring" seals) as well as the manner in which

the pivot-group parts have been arranged and put together, all of which contribute to keeping the bearing areas and other areas free from dirt and debris.  (Karani Dep. 210:2–212:11.)

Defendants argue that there is nothing secret about the fact that the pivot group of the Allied MT stays intact because it is a patented feature which Allied openly promotes. As to the promotion argument, Allied claims that it never openly promoted the fact that its pivot group stay intact until *after* Genesis began advertising the same feature for its LXP.  Regardless, however, Allied admits that its Allied MT patents do indicate that the pivot of the MT stays intact.

Nevertheless, as discussed *supra*, Genesis did not review any of the Allied MT patents in designing or developing the LXP.   Consequently, Defendants disclosure argument amounts to a *post hoc* rationalization, which the Court will not countenance. See, e.g., Norbrook Labs. v. G.C. Hanford Mfg. Co., 297 F. Supp. 2d 463, 486 (N.D.N.Y. 2003) (citing Franke v. Wiltschek, 209 F.2d 493, 495 (2d Cir. 1953)); See also Vitro Corp. of America v. Hall Chemical Co., 254 F.2d 787, 793 (6th Cir. 1958) (citing Franke).

The Court finds that there is a genuine issue of material fact as to whether the manner in which the pivot group operates is a protectable trade secret.

### *e*) The Way the Shaft is Retained

Karani identifies the way the shaft is retained as a protectable trade secret that Defendants misappropriated.  (Karani Rep., at 11.)   During Karani's deposition, he explained, "The way that the shaft is retained implies the . . . pivot group as a whole with

24

regards to the shafts, the bearings, the bolting arrangement, the . . . concept of how that whole shaft and pivot group are . . . put together."  (Karani Dep. 7:1–7:5, Aug. 6, 2008.)

Defendants argue that Karani cannot identify any information about the way the shaft is retained that is not reflected in the Allied MT Owner's Manual.  (Dkt. # 112, at 23.)  Defendants also assert that the end caps and cap screws that retain the shaft are readily ascertainable upon inspection.  (Dkt. # 112, at 23.)  Lastly, Defendants claim that Allied has failed to explain how the manner in which the shaft is retained facilitates so-called "heavy-duty shearing," or otherwise explain a basis for contending that it is an independent source of economic value.  (Dkt. # 112, at 23.)

As to the Owner's Manual, Allied points to Karani's assertion that the figures of the main pivot group in Allied's Owner's Manual were "general by design and did <u>not</u> include the specific information that was included in the engineering drawings that Mark Ramun retained, like Gator 34.  (Dkt. # 129, at 46.)  Regarding the observable caps and screws, Allied states that it is not claiming that the end caps and cap screws are trade secrets.  (Dkt. # 129, at 46.)  As to Defendants final argument, Allied points to Defendants' own expert's testimony, in which he admits that the LXP and the MT are the same in terms of being able to field change a jaw set without removing the main pivot pin from the jaw set.  (Dkt. # 129, at 46.)  Moreover, Allied refers to Karani's expert report, in which he explains that the retention of the main pivot group is critical in allowing a multi-purpose tool to perform heavy-duty shearing.  (Dkt. # 129, at 46.)

Upon review, there is at least a genuine issue of material as to whether the way the shaft is retained is a protectable trade secret.

25

### *f*) Allied's Business Plan

Allied identifies its business plan as a protectable trade secret that Defendants misappropriated. The business plan includes "Allied's internal strategy for developing, designing, manufacturing and marketing an entire product line for the demolition industry, including a multi-processor and claw bucket." (Dkt. # 129, at 47.) More specifically, the business plan includes "sensitive financial and cost data and production schedules, along with detailed engineering drawings and detailed descriptions of the benefits and features of each . . . tool." (Dkt. # 129, at 47.)

Defendants claim that Allied's business plan or "vision" is disclosed in Allied's patent. But, in doing so, Defendants misconstrue what Allied is claiming as a trade secret. Allied's business plan is not limited to the concept of a demolition tool that combines 'heavy duty' shearing capability in a 'multi-purpose' machine. (Dkt. # 112, at 24.) Rather, Allied's business plan encompasses its entire internal business strategy for rolling out a complete line of tools to market in the demolition industry. The patents do not disclose the level of detail contained in the joint venture presentations and business plans that Mark Ramun allegedly misappropriated. For example, the joint venture presentations contained detailed engineering data, cost data, and production/scheduling information that is not publicly disclosed in Allied's patents or elsewhere. (Grieco Decl. Ex. 205, GATOR 2–4, 40–41, and 283, among others.)

Defendants insist that this detailed information cannot qualify as a trade secret because it is readily ascertainable and pertains to a product that was never made. (Dkt. # 138, at 32–33.) But the engineering information that Allied claims as a trade secret is not

just the formulas and relationships of forces, as Defendants suggest; rather, the trade secret consists of the actual data that allows an engineer to make those calculations. (Dkt. # 129, at 48–49.)  Moreover, while some of the claimed information relates to products other than the Allied MT, these other products were either early prototypes of the Allied MT or otherwise a part of the trial and error process that ultimately led to the Allied MT.  (Dkt. # 129, at 49.)

For these reasons, the Court finds that there is at least a genuine issue of material fact as to whether Allied's business plan—including detailed engineering data, cost data, and production/scheduling information—constitutes a protectable trade secret.

### 6. Damages

Defendants urge the Court to dismiss Allied's trade secret claim because it is entirely speculative and based upon a flawed assumption—i.e., that, but for the misappropriation, Allied would have captured each and every Genesis sale (of the LXP or VersiPro) through March 2008.  (Dkt. # 112, at 26.)  Notably, Defendants assert that "a plaintiff is only entitled to those damages that are 'the actual loss caused' by the misappropriation."  (Dkt. # 112, at 26.)

However, a plaintiff's entitlement to damages is not as narrow as Defendants suggest.  Ohio Revised Code § 1333.63 states in pertinent part:

> (A) . . . . Damages may include both the actual loss caused by
> misappropriation and the unjust enrichment caused by
> misappropriation that is not taken into account in computing
> actual loss. In lieu of damages measured by any other
> methods, the damages caused by misappropriation may be
> measured by imposition of liability for a reasonable royalty
> that is equitable under the circumstances considering the loss

27

> to the complainant, the benefit to the misappropriator, or
> both, for a misappropriator's unauthorized disclosure or use of
> a trade secret.
> (B) If willful and malicious misappropriation exists, the court
> may award punitive or exemplary damages in an amount not
> exceeding three times any award made under division (A) of
> this section.

Ohio Rev. Code § 1333.63(A)–(B).  The plain language of § 1333.63 contemplates damages not only for actual loss but also for unjust enrichment and punitive purposes; and damages may take the form of an equitable royalty.

Moreover, the allegedly speculative nature of Allied's damages is not dispositive at the summary-judgment stage.  As the Sixth Circuit stated in affirming the denial of a motion for summary judgment, "Damages cannot be speculative, but this only means that the *facts* of damages, not their amount, cannot be uncertain."  Pfahler v. Nat'l Latex Prods. Co., 517 F.3d 816, 837 (6th Cir. 2007); see also Bauman v. Volkswagen Aktiengesellschaft, 621 F.2d 230, 235 (6th Cir. 1980) ("Where the evidence is sufficient to establish liability and causation, we do not believe we should remove the case from the jury because the precise extent of the injuries caused by the defendant's wrong is uncertain.  Damages are often uncertain.").  At this stage, Allied has presented enough circumstantial evidence to demonstrate to the Court that there is at least a genuine issue of material fact as to whether Defendants misappropriated Allied's trade secrets.  See, e.g., Stratienko v. Cordis Corp., 429 F.3d 592, 600 (6th Cir. 2005) ("Permitting an inference of use from evidence of access and similarity is sound because 'misappropriation and misuse can rarely be proved by convincing direct evidence.'"); Veteran Medical Prods., Inc. v. Bionix Dev. Corp., No 1:05-cv-655, 2008 WL 696546, at

*10 (W.D. Mich. Mar. 13, 2008) ("Based on the circumstantial evidence, a jury could reasonably infer that plaintiffs misappropriated" defendant's trade secrets.). That the precise extent of Allied's damages may be uncertain does not, in and of itself, entitle the Defendants to summary judgment.

In sum, the Court DENIES Defendants' Motion for Summary Judgment with respect to Counts VII and VIII.

### C. Preemption of Common-Law Claims (Counts II, III, IV)

Allied's Complaint asserts common-law claims of (1) tortious interference with contract (Count II); (2) breach of fiduciary obligation (Count III); and (3) conspiracy to breach fiduciary obligation (Count IV). (Dkt. # 1.)

Defendants claim that the UTSA, as adopted by Ohio (Ohio Rev. Code § 1333.67), preempts Allied's common-law claims because those claims "'are based entirely on factual allegations of misappropriation of trade secrets.'" (Dkt. # 138, at 37 (citing Glasstech, Inc., v. TGL Tempering Sys., Inc., 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999)).) Allied claims (1) that Ohio Revised Code § 1333.67 does not preempt the above-mentioned claims, and (2) that, even if § 1333.67 could preempt its common-law claims, it would be premature for the Court to grant preemption until it determines whether Allied's claims constitute a trade secret. (Dkt. # 129, at 58–61; Dkt # 128, at 4–9.) For the reasons that follow, the Court finds that Allied's common-law claims are preempted by § 1333.67. Therefore, the Court GRANTS Defendants' Motions for Summary Judgment with respect to Counts II, III, and IV.

Ohio's UTSA preemption provision, § 1333.67, preempts common-law claims for misappropriation of a trade secret, with three exceptions.  Section 1333.67 provides:

> (A) Except as provided in division (B) of this section, sections 1333.61 to 1333.69 of the Revised Code displace conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.

> (B) Sections 1333.61 to 1333.69 of the Revised Code do not affect any of the following:

>> (1) Contractual remedies, whether or not based on misappropriation of a trade secret;

>> (2) Other civil remedies that are not based on misappropriation of a trade secret;

>> (3) Criminal remedies, including those in other sections of this chapter, whether or not based on misappropriation of a trade secret.

In interpreting the UTSA's preemption provision, courts have uniformly found that the UTSA displaces previously existing misappropriation-of-trade-secret actions, whether statutory or common law.  Hauck Mfg. Co. v. Astec Indus., Inc., 375 F. Supp. 2d 649, 654 (E.D. Tenn. 2004).  And, notwithstanding the language of the preemption provision (which purportedly limits displacement only to "conflicting tort, restitutionary, and other laws . . . providing civil remedies for *misappropriation of a trade secret*"), courts have generally found that the UTSA preempts "all alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information falling short of trade-secret status (e.g., idea misappropriation, information piracy, theft of commercial information, *etc.*)."  Id. at 655 (citing cases).

30

However, beyond those preliminary areas of agreement, courts have differed on the appropriate scope of preemption.  Some courts have permitted plaintiffs to use generally applicable tort claims (including breach of fiduciary duty and tortious interference with contract) to protect non-trade-secret information.  Id. at 655; see e.g. IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581, 586 (7th Cir. 2002) (tortious interference with contract); United States Gypsum Co. v. LaFarge N. Am., Inc., 508 F. Supp. 2d 601, 637 (N.D. Ill. 2007) (breach of fiduciary duty and inducement of breach of fiduciary duty).

But some courts have interpreted the UTSA's preemption provision more broadly, finding displacement of all non-contract common-law claims that rely on misappropriation-of-trade-secret facts.  Id. at 655 (citing Thomas & Betts Corp. v. Panduit Corp., 108 F. Supp. 2d 968, 971 (N.D. Ill. 2000) ("Illinois courts . . . repeatedly have applied [the UTSA preemption provision] to preempt non-contract claims to the extent that they are based on a misappropriation of trade secrets.")); see also, lucini Italia Co. v. Grappolini, 231 F. Supp. 2d 764, 768 (N.D. Ill. 2002) ("If the common law claims rely on the trade secret facts, they are preempted and will be dismissed."); AutoMed Techs., Inc. v. Eller, 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001) (to avoid preemption, cause of action must "state[] an independent claim, completely distinct from any trade secrets."); Auto Channel, Inc. v. Speedvision Network, LLC, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001) (plaintiffs' claims preempted if "the claim[s] seek[] a remedy for the misappropriation of trade secrets."); Smithfield Ham & Prods. Co. v. Portion Pac, 905 F. Supp. 346, 348–49 (E.D. Va. 1995) ("[P]laintiff must be able to show that the distinct

31

theories of relief sought are supported by facts unrelated to the misappropriation of the trade secret."); Weins v. Sporleder, 605 N.W.2d 488, 491–92 (S.D. 2000) (tort claims displaced as a matter of law because said claims were "so inextricably linked to the trade secret claim . . . .").

Other courts have interpreted the UTSA's preemption provision more narrowly, displacing common-law claims only where such claims are based solely on the same facts which would "'plainly and exclusively spell out only trade secret misappropriation.'" Powell Prods. v. Marks, 948 F. Supp. 1469, 1474 (D. Colo. 1996) (quoting Roger M. Milgrim, Milgrim on Trade Secrets, §1.01[4], at 1-68.14 (1996)); see also, Glasstech, Inc. v. TGL Tempering Sys., Inc., 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999) (UTSA preempts "claims which are based entirely on factual allegations of misappropriation of trade secrets.").

Upon consideration of these varying interpretations as to the proper scope of UTSA preemption, the Court is persuaded that—consistent with the UTSA's goals of promoting uniformity and predictability—the appropriate scope of displacement should be defined by the "same facts" or "same proof" standard.  See, e.g., Hauck Mfg. Co. v. Astec Indus., Inc., 375 F. Supp. 2d 649, 658 (E.D. Tenn. 2004) (under the "same proof" standard, "if proof of a non-UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective of whatever surplus elements or proof were necessary to establish it."); Glasstech, Inc. v. TGL Tempering Sys., Inc., 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999) (under the "same facts" standard the UTSA preempts common-law "claims which are based entirely on factual allegations of

32

misappropriation of trade secrets."); <u>Powell Prods. v. Marks</u>, 948 F. Supp. 1469, 1474 (D. Colo. 1996) (under the "same facts" standard, "[p]reemption is only appropriate where [the] 'other [common-law] claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation.'").  Thus, to avoid preemption, the underlying facts supporting Allied's common-law claims must not be merely a restatement of the factual proof supporting its trade-secret-misappropriation claims.

Moreover, despite Allied's contention to the contrary, the Court need not first determine whether the information that Allied alleges was misappropriated constitutes a trade secret before determining whether § 1333.67 displaces Allied's common-law claims.  While some courts have indeed allowed plaintiffs to proceed with common-law claims until it can be determined whether the information at issue constitutes a trade secret, other courts—representing the majority view—have rejected this approach.  <u>See, e.g.</u>, <u>Chatterbox, LLC v. Pulsar EcoProducts, LLC</u>, No. CV 06-512-S-LMB, 2007 U.S. Dist. LEXIS 34022, at *8 (D. Idaho  May 9, 2007) (citing "majority view" cases); <u>Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.</u>, 270 F. Supp. 2d 943, 948–49 (W.D. Mich. 2003) ("[A]llowing otherwise displaced tort claims to proceed on the basis that the information may not rise to the level of a trade secret would defeat the purpose of the UTSA."); <u>Ethypharm S.A. France v. Bentley Pharms., Inc.</u>, 388 F. Supp. 2d 426, 433 (D. Del. 2005) ("Because all claims stemming from the same acts as the alleged misappropriation are intended to be displaced, a claim can be displaced even if the information at issue is not a trade secret.").  Thus, the Court joins the majority view in

finding that displacement of common-law claims may precede the Court's determination of whether the information at issue constitutes a trade secret.  To find otherwise would contravene the general purpose of Ohio's UTSA: uniformity.  See Ohio Rev. Code § 1333.68 (2006) ("Sections 1333.61 to 1333.69 of the Revised Code shall be applied and construed to effectuate their general purpose to make uniform the law with respect to their subject among states enacting them.").

Having determined the appropriate scope of preemption, and having found that the preemption analysis is not premature at this juncture, the Court will now turn to an analysis of whether § 1333.67 preempts Allied's aforementioned common-law claims: (1) tortious interference with Contract, (2) breach of fiduciary duty, and (3) conspiracy to breach fiduciary obligation.  As previously stated, displacement of Allied's common-law claims is appropriate if the facts supporting those claims are merely a restatement of the same operative facts supporting its trade-secret-misappropriation claim.  See Powell Prods. v. Marks, 948 F. Supp. 1469, 1474 (D. Colo. 1996).

In support of its UTSA claim, Allied alleges that "Mark Ramun disclosed to Genesis the highly confidential and proprietary information and documentation in his possession," and that "Genesis knew, or had reason to know, that this information . . . was acquired by Ramun by improper means and . . . was disclosed without the express or implied consent of Plaintiffs."  (Compl. ¶ 63.)  For the following reasons, § 1333.67 displaces each of Allied's common-law claims.

### 1. Tortious Interference with Contract (Count II)

The factual allegations that Allied makes in support of its tortious-interference-with-contract claim are merely a restatement of the same operative facts supporting its trade-secret-misappropriation claim.  In support of its tortious-interference-with-contract claim, Allied alleges that Mark Ramun "fail[ed] to return the confidential and proprietary documents he obtained from Allied and Gator at the termination of his employment," and that "Genesis knew, or reasonably should have known, that the confidential documents and information Ramun possessed, and disclosed to Genesis, was [sic] acquired by improper means and was [sic] disclosed to Genesis without the express or implied authority of Plaintiffs."  (Compl. ¶¶ 36–7.)  These allegations "are based entirely on factual allegations of misappropriation of trade secrets."  Glasstech, Inc. v. TGL Tempering Sys., Inc., 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999); see also Greif, Inc v. MacDonald, No. 3:06CV-312-H, 2007 WL 679040, at *2 (W.D. Ky. Mar. 1, 2007) (tortuous-interference claim preempted because it was "based entirely upon the allegation that . . . defendants disclosed confidential business information and trade secrets . . . .").  Consequently, § 1333.67 preempts Allied's claim for tortious interference with contract.

In arguing against preemption, Allied relies, in part, on a Seventh Circuit opinion in which Judge Easterbrook states, "The tort of inducing breach of a non-disclosure contract . . . is 'not based upon misappropriation of a trade secret.'  It is based on interference with the contract."  IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581, 586 (6th Cir. 2002.  In making such a categorical determination, however, Judge Easterbrook did not compare the underlying facts of each claim to ascertain whether the plaintiff had

merely restated the misappropriation-of-trade-secret facts in support of its tortious-interference-with-contract claim.  Such a categorical analysis seems misplaced, and, in any event, the Court sides with those courts that require consideration of the factual allegations to determine whether the UTSA preempts a particular claim.  See Hauck Mfg. Co. v. Astec Indus., Inc., 375 F. Supp. 2d 649, 656 (E.D. Tenn. 2004).  Accordingly, the Court finds that § 1333.67 displaces Allied's tortious-interference-with-contract claim.

### 2. Breach of Fiduciary Obligation (Count III)

The factual allegations that Allied makes in support of its breach-of-fiduciary-obligation claim against Mark Ramun simply restate the same operative facts supporting its trade-secret-misappropriation claim.  In support of its breach-of-fiduciary-obligation claim Allied asserts, "By failing to return confidential documentation at the termination of his employment and by disclosing confidential information and documentation to Genesis, Ramun breached his fiduciary obligations . . . ."  (Compl. ¶ 43.)  In support of its misappropriation-of-trade-secrets claim against Mark Ramun Allied makes a nearly identical assertion: "In failing to return this highly confidential documentation upon the termination of his employment, and in disclosing it to Genesis, Ramun intentionally and wrongfully misappropriated trade secrets . . . ."  (Compl. ¶ 60.)  That these factual allegations mirror one another so precisely demonstrates that the factual proof underlying each claim is the same; therefore, preemption is appropriate.  See Thomas & Betts Corp. v. Panduit Corp., 108 F. Supp. 2d 968, 972 (N.D. Ill. 2000) (UTSA preempts breach-of-fiduciary-duty claim where factual support for the claim "simply constitute[s] allegations of a misappropriation of trade secrets . . . .").

36

As previously discussed, there is ample support for the general proposition that the UTSA preempts common-law claims that rely on the same factual allegations supporting misappropriation-of-trade-secret claims.  See, e.g., Hauck Mfg. Co. v. Astec Indus., Inc., 375 F. Supp. 2d 649, 658 (E.D. Tenn. 2004); Bliss Clearing Niagra, Inc. v. Brake Bond Co., 270 F. Supp. 2d 943, 949 (W.D Mich. 2003); Auto Channel, Inc. v. Speedvision Network, LLC, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001); Glasstech, Inc. v. TGL Tempering Sys., Inc., 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999).

Moreover, numerous cases support the more specific proposition that the UTSA preempts *breach-of-fiduciary-duty claims* that rely on misappropriation-of-trade-secret facts.  For example, in Thomas & Betts Corp. v. Panduit Corp., 108 F. Supp. 2d 968, 973 (N.D. Ill. 2000), the court found that the Illinois UTSA preempted plaintiffs' breach-of-fiduciary-duty claim because plaintiffs' factual allegations "simply allege[d] that [the defendant] took, disclosed[,] and used confidential information."  In Omnitech Int'l v. Clorox Co., 11 F.3d 1316, 1330 (5th Cir. 1994), the Fifth Circuit found that the Louisiana UTSA preempted a breach-of-fiduciary-duty claim because the plaintiff's factual support for the claim was merely a restatement the misappropriation-of-trade-secret facts.   In Auto Channel, Inc v. Speedvision Network, LLC, 144 F. Supp. 2d 784, 793 (W.D Ky. 2001), the court found that the UTSA preempted plaintiffs' breach-of-fiduciary-duty claim "to the extent [that] claim[] involve[d] disclosure of trade secrets . . . ."  In Franz v. Johnson, 999 P.2d 351, 358 (Nev. 2000), the Nevada supreme court found that the trial court erred in awarding damages for a breach-of-fiduciary-duty claim because the Nevada UTSA preempted that cause of action, which "arose from a single factual

37

episode, namely misappropriation of bidding and pricing information."  As the court

explained, "The factual circumstances underlying the [breach-of-fiduciary] claim[] in this

matter . . . are completely dependent on the facts concerning misappropriation of trade

secrets . . . therefore [the breach-of-fiduciary-duty claim is] barred by the UTSA."  999

P.2d 351, 358 n.3.  In <u>RPM, Inc v. Oatey Co.</u>, No. 3282-M, 3289-M, 2005 WL 663057,

at *5 (Ohio Ct. App. Mar. 23, 2005), the Ohio Court of Appeals stated:

> Effective July 20, 1994, Ohio also adopted the Uniform Trade
> Secrets Act.  See [sic] R.C. [§] 1333.67.  Thus, applying the
> legal reasoning cited in RPM's own brief, even if the
> disclosure of trade secrets could create a fiduciary
> relationship, any claim for breach of that relationship has
> been displaced in Ohio by the Uniform Trade Secrets Act.

Of course, where a claim for breach of fiduciary duty has an independent factual

basis, which is not solely dependent on misappropriation-of-trade-secret facts, courts

have concluded there is no preemption.  <u>See</u>, <u>e.g.</u>, <u>Lucini Italia Co. v. Grappolini</u>, 231 F.

Supp. 2d 764, 770 (N.D. Ill. 2002) (no preemption where alleged breach of duty—i.e.,

that plaintiff's consultant used his position of trust to contract on his own behalf for his

own interests—"states an independent cause of action without relying on the

misappropriation of a trade secret."); <u>AutoMed Techs., Inc. v. Eller</u>, 160 F. Supp. 2d 915,

922 (N.D. Ill. 2001) (no preemption where breach-of-fiduciary-duty allegations—i.e.,

that defendant usurped a corporate opportunity for his own benefit—"state[d] an

independent claim, completely distinct from any trade secrets.").

Here, however, Allied's breach-of-fiduciary-duty claim has no independent factual

basis; rather, the claim is solely dependent upon misappropriation-of-trade-secret facts.

And the Court will not engage in the sort of categorical preemption analysis urged by Allied (Dkt. # 128, at 5), which would preclude preemption of Allied's breach-of-fiduciary-duty claim without regard for the fact that the claim merely restates the factual allegations underlying its misappropriation-of-trade-secret claim.  Such an approach would be antithetical to the fundamental purpose of the UTSA's preemption provision: "[T]o prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery [that] are premised on the misappropriation of a trade secret." Smithfield Ham & Prods. Co. v. Portion Pac, 905 F. Supp. 346, 348 (E.D. Va. 1995).  Therefore, the Court finds that § 1333.67 preempts Allied's breach-of-fiduciary-duty claim against Mark Ramun.

### 3. Conspiracy to Breach Fiduciary Obligation (Count IV)

The factual allegations that Allied makes in support of its conspiracy-to-breach-fiduciary-obligation claim against Genesis are merely a restatement of the same operative facts supporting its trade-secret-misappropriation claim.  In support of its conspiracy-to-breach-fiduciary-obligation claim, Allied alleges, "In obtaining and using the highly confidential and proprietary information and documentation provided by Ramun . . . Genesis acted . . . with Ramun . . . to misappropriate confidential information and/or trade secrets . . . ."  (Compl. ¶ 46.)  In the previous section, the Court found that § 1333.67 preempts Allied's breach-of-fiduciary-duty claim against Mark Ramun.  In accordance with that reasoning, the Court finds that § 1333.67 also preempts Allied's conspiracy-to-breach-fiduciary-duty claim.

In sum, the Court GRANTS Defendants' Motion for Summary Judgment with respect to Counts II, III, and IV.

### D. Lanham Act, Ohio Deceptive Practices Act, and Commercial Disparagement (Counts V, VI, and IX)

Allied alleges claims for (1) false advertising, under both the Lanham Act (Count V) and the Ohio Deceptive Trade Practices Act ("ODTPA") (Count VI), and (2) for Commercial Disparagement, also under the ODTPA (Count IX).

#### 1. False Advertising

To prove a claim for false advertising or commercial disparagement under the Lanham Act, a plaintiff must establish that:

> (1) the defendant has made false or misleading statements of fact concerning his product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff.

Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc., 270 F.3d 298, 323 (6th Cir. 2001). Under the ODTPA, the same analysis is to be employed for false-advertising claims. See, e.g., HER, Inc. v. RE/MAX First Choice, LLC., 468 F. Supp. 2d 964, 979 (S.D. Ohio 2007) ("'[A]n analysis appropriate for a determination of liability under . . . the Lanham Act is also appropriate for determining liability under the [ODTPA].'").

Allied's first false-advertising claim (Count V, under the Lanham Act) alleges that Genesis has made false and/or misleading statements in its advertisements for the LXP. Specifically, Allied alleges that, contrary to Genesis's advertisements, the LXP is neither

"revolutionary" nor "unique": "At a minimum, even if not ultimately determined to be false, these statements are misleading statements that are actionable under both the Lanham Act and [the ODTPA]."  (Dkt. # 129, at 63.)

However, Genesis's advertising claim that the LXP is "revolutionary" and "unique" constitutes "a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than mere expression of opinion."[2]  Pizza Hut v. Papa John's Int'l, 227 F.3d 489, 497 (5th Cir. 2000).   In other words, these statements amount to mere puffery; consequently, they are not actionable under the Lanham Act or the ODTPA.  See Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc., 326 F.3d 687, 699 (6th Cir. 2003) ("[C]alling the Mobile Desk 'redesigned and improved' is mere puffery which is not actionable under the Lanham Act."); Outdoor Technologies, Inc. v. Vinyl Visions, LLC, No. 1:06-cv-044, 2006 WL 2849782, *4 (S.D. Ohio Sept. 29, 2006) (finding that "the statements 'most weatherable' and 'strongest warranty' are mere 'puffery' . . . . 'Puffery' is exaggerated blustering or subjective boasting upon which no reasonable consumer would rely.").

 Allied's second advertising claim (Count VI, under the ODTPA) alleges that "Genesis's advertising creates a substantial likelihood of confusion between Genesis's XP and LXP and the Allied MT because there is an overwhelming similarity in the pictures, layouts and descriptions of these competing products . . . ." (Compl. ¶ 57.)  But Allied has failed to provide the Court with physical evidence to demonstrate that there is, in fact, an overwhelming similarity in the pictures, layouts, and descriptions of the

_____

[2] Similarly, Genesis's claim that the LXP "outlasts traditional piercing tips" and provides "unmatched power" (Dkt. # 129, at 66 n.34) is mere puffery, which is not actionable under the Lanham Act.

competing products—or that there is at least a genuine issue of material fact as to whether there is an overwhelming similarity.  Rather, in a footnote, Allied provides the following examples to demonstrate the overwhelming similarity of the copy in the competing advertisements:

> Slogan:
> > Allied—"Any way you look at it [a shear]"
> > Genesis—"Will change the way you look at a shear"
>
> Shear Tip Durability:
> > Allied—"outlasts . . . conventional shear tips"
> > Genesis—"outlasts traditional piercing tips"
>
> Tool Jaw Speed:
> > Allied—"faster cycle times" through Allied's "Speed Circuit Technology"
> > Genesis—"fast cycle times" through Genesis's "Regen Technology"
>
> Power:
> > Allied—"most powerful"
> > Genesis—'unmatched power"

(Dkt. # 129, at 67 n.36.)  Curiously, Allied does not indicate from where these excerpts have been plucked; nor does it provide the Court with copies of these advertisements to support its claims.

Moreover, while there is admittedly some similarity between the excerpts, it is also commonsensical that the use of such buzzwords—e.g., "powerful," "fast," "outlasts"—to trumpet a demolition tool's speed, versatility, durability, and power is ubiquitous within the industry.  Indeed, Genesis provided the Court with its own advertisements that date as far back as 2000, which demonstrate that it has long used

42

these common buzzwords to promote the speed, versatility, durability, and power of its products. (Dkt. # 112, at 29; Bacon Decl., Ex. Q.)

Although Genesis bears the burden, at this stage, to identify the evidence which it believes demonstrates "the absence of a genuine issue of material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), Genesis may meet that burden by pointing out to the district court that there is an absence of evidence to support an essential element of the nonmoving party's case. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (citing Celotex, 477 U.S. 317, 325). Here, Genesis states, "[T]o support its claim, Allied simply provided unremarkable snippets of Genesis' ads compared to Allied's ads and offered *no* evidence of customer confusion. It does not argue that customer confusion even exists; therefore, summary judgment should be granted." (Dkt. # 138, at 46.)

The Court finds that Allied has failed to provide evidence demonstrating either (1) an overwhelming similarity in the competing advertisements, or (2) a likelihood of confusion. See Decker Inc. v. G & N Equip. Co., 438 F. Supp. 2d 734, 744 (E.D. Mich. 2006) (summary judgment granted where plaintiff failed to submit sufficient evidence to show likelihood of confusion between its catalog and the defendant's); Dragani v. Eastman Kodak Co., 576 F. Supp. 755, 766 (S.D. Ohio 1983) (summary judgment granted because, inter alia, there was no factual basis for the allegation that the defendant caused a likelihood of confusion as to the source of goods or services).

### 2. Commercial Disparagement

Under the ODTPA, "[a] person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person . . . (10) Disparages the goods, services, or business of another by false representation of fact."  Ohio Rev. Code § 4165.02(A).  To prevail on a disparagement claim, "'a plaintiff must show that the defendant made a *false representation of fact*.'"  White Mule Co. v. ATC Leasing Co. LLC, 540 F. Supp. 2d 869, 895 (N.D. Ohio 2008) (quoting Northeast State College of Massotherapy v. Burek, 759 N.E.2d 869, 876 (Ohio Ct. App. 2001)).  Here, as previously discussed, Genesis's use of terms such as "revolutionary" and "unique" constitutes "a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than mere expression of opinion."  Pizza Hut v. Papa John's Int'l, 227 F.3d 489, 497 (5th Cir. 2000).  In other words, these statements are mere puffery; they do not amount to a false representation of fact.  Therefore, they are not actionable under the ODTPA.

In sum, the Court GRANTS Defendants' Motion for Summary Judgment with respect to Counts V, VI, and IX.

### E. Patent Mismarking (Count X)

Allied alleges a claim for patent mismarking (Count X), pursuant to 35 U.S.C. § 292, based on the fact that an initial advertisement for Genesis's LXP incorrectly stated that it was "patented" instead of "patent-pending."  Genesis subsequently obtained a patent for the LXP.  But it is undisputed that, at that time, the advertisement incorrectly labeled the LXP "patented" when, in fact, it was not.  It is also undisputed that Genesis

44

immediately changed its advertisements upon receiving notice of the mislabeled advertisement.

The patent marking statute, § 292, states:

> Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented, *for the purpose of deceiving the public*;
>
> . . . .
>
> Shall be fined not more than $ 500 for every such offense.

35 U.S.C. § 292(a) (2006) (emphasis added).  "As a general proposition, there can be no violation of § 292 absent an evidentiary showing that the false marking or mismarking was 'for the purpose of deceiving the public.'"  Arcadia Machine & Tool, Inc. v. Sturm, Ruger & Co., 786 F.2d 1124, 1125 (Fed. Cir. 1986).  Allied cites Krieger v. Colby, 106 F. Supp 124, 130 (S.D. Cal. 1952), for the proposition that it is entitled to a presumption as to Genesis's intent to deceive; that is, the Court should presume that Genesis mislabeled its advertisement with the intent to deceive until Genesis provides evidence to the contrary.  (Dkt. # 129, at 69.)  But the great weight of recent caselaw supports the opposite view—i.e., that plaintiffs have the burden of proving that the defendant acted with the specific intent to deceive.  See, e.g., Laughlin Prods. v. ETS, Inc., 257 F. Supp. 2d 863, 870–71 (N.D Tex. 2002) (citing cases); Sadler-Cisar, Inc. v. Commercial Sales Network, Inc., 786 F. Supp. 1287, 1296 (N.D. Ohio 1991).  Accordingly, the Court concludes that Allied has the burden to prove that Genesis mislabeled its advertisements with the specific intent to deceive.

45

Allied cannot carry this burden.  Allied has failed to produce any evidence of Genesis's intent to deceive the public.  Rather, Allied relies upon its burden-shifting authority, which the Court has rejected, and contends that Genesis would not have corrected the mislabeled advertisements if it had not been "caught and effectively forced to change its advertising."  (Dkt. # 129, at 69.)  But the same would be true if Genesis had merely made an inadvertent mistake—i.e., Genesis would not have corrected the mistake until it became aware of the mistake.  Allied has failed to identify any specific facts to demonstrate that Genesis mislabeled its advertisements with the specific intent to deceive.  See Arcadia Machine & Tool, Inc. v. Sturm, Ruger & Co., 786 F.2d 1124, 1125 (Fed. Cir. 1986) (affirming summary judgment where plaintiff "had totally failed, after at least nine months of discovery, to produce any evidence of intent to deceive the public. Nor had it produced 'any evidence suggesting that evidence of intent could be produced at the time of trial.'").  Allied's "bald assertion" that genuine issues of material fact remain as to whether Genesis mislabeled its advertisements with the intent to deceive is "insufficient to comply with the requirements of *Rule 56*."  Genlyte Group LLC v. Nat'l Serv. Indus., 262 F. Supp. 2d 753, 576 (W.D. Ky. 2003) (citing Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 70 F. Supp. 2d 944, 983 (N.D. Iowa 1999)).  Because there is no genuine issue of material fact as to whether Genesis intended to deceive the public, summary judgment is appropriate.

In sum, the Court GRANTS Defendants' Motion for Summary Judgment with respect to Count X.

### F. Breach of Contract (Count I)

Allied alleges a claim against Mark Ramun for breach of his employment contract (Count I).  Specifically, Allied states that a breach occurred when Mark Ramun failed to return confidential documents at the termination of his employment, and subsequently disclosed confidential information and documents to Genesis.  (Compl. ¶ 33.)  However, as Mark Ramun points out, his employment agreement expressly states that it is "by and between" him and Allied Erecting & Dismantling Co., Inc.  ("Allied Erecting").  But Allied doesn't claim that Mark Ramun retained or disclosed *Allied Erecting*'s confidential information; rather, Allied contends that he breached his employment agreement when he retained and disclosed *Allied-Gator's* (allegedly) confidential information.

"When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties."  Westfield Ins. Co. v. Galatis, 797 N.E.2d 1256, 1261 (Ohio 2003).  In other words, where a contract is clear and unambiguous, "the court need not . . . go beyond the plain language of the agreement to determine the rights and obligations of the parties."  Bucher v. Schmidt, 2002 Ohio 3933. Here, Mark Ramun's employment agreement unambiguously states that it is "by and between" him and Allied Erecting.  Because the contract is clear and unambiguous "the [C]ourt must give effect to the language of the contract."  Id.  Therefore, as Allied does not claim that Mark Ramun retained or disclosed Allied Erecting's confidential information, Mark Ramun is entitled to summary judgment on Allied's breach of contract claim.

47

In sum, the Court GRANTS Mark Ramun's Motion for Summary Judgment with respect to Count I.

## IV. CONCLUSION

For the forgoing reasons, the Court hereby **GRANTS IN PART** Defendants' Motions for Summary Judgment as follows: as to Counts I, II, III, IV, V, VI, IX, and X, Summary Judgment is **GRANTED**; as to Counts VII and VIII, Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

<u>**/s/ Peter C. Economus – August 11, 2009**</u>
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**