# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **ALLIED ERECTING AND DISMANTLING CO., INC.,** *et al.*, | ) | **CASE NO.  4:06CV114** |
| | ) | |
| **PLAINTIFFS,** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **GENESIS EQUIPMENT & MANUFACTURING, INC.,** *et al.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| **DEFENDANTS.** | ) | |

The instant matter is before the Court upon several post-judgment motions filed by the parties.  Defendants have filed a Motion to Stay Enforcement of Judgment, which Plaintiffs have not opposed.  (Dkt. # 248).  Plaintiffs have filed a Motion for Attorneys' Fees and a Motion for Prejudgment Interest.  (Dkt. # 252, 254).  Defendants have opposed both motions and Plaintiffs have replied.  (Dkt. # 263, 260, 269, 270).  Defendants have filed a Motion for Judgment as a Matter of Law or, Alternatively, for New Trial.  (Dkt. # 264).  Plaintiffs have filed a response in opposition to such Motion and Defendants have filed a reply.  (Dkt. # 275, 277).  Finally, Plaintiffs have filed a Motion for New Trial on Lost Profits and Punitive Damages.  (Dkt. # 265).  Defendants have filed a response in opposition and Plaintiffs have filed a reply.  (Dkt. # 274, 276).

I.    **DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR NEW TRIAL**

A.    **Motion for Judgment as a Matter of Law**

1.    *Background*

Following a trial on the merits, the jury returned a verdict for Plaintiffs, finding that Plaintiffs were entitled to an award of $3,046,800.  The verdict was based upon jury's determination that Defendants were unjustly enriched by the misappropriation of Plaintiffs' trade secrets.  (Dkt. # 242).  The jury specifically found that Plaintiffs had suffered no lost profits as a result of such misappropriation.  (Dkt. # 242).  In a bifurcated proceeding, the jury declined to award punitive damages against Defendant Genesis Equipment & Manufacturing, Inc. ("Genesis").  (Dkt. # 243).

Defendants now argue that they are entitled to judgment as a matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, because there is no reasonable basis upon which the jury could have awarded unjust enrichment damages and because Plaintiffs failed to prove misappropriation of an actual trade secret.  (Dkt. # 264).  As an initial matter, the Court notes that Defendants moved for judgment as a matter of law, pursuant to Rule 50(a), after the close of Plaintiffs' case.  (Dkt. # 232, Trial Transcript Vol. 6, pp. 1130-33).  At that time, the Court did not grant the Motion.  (Dkt. # 232, Trial Tr. Vol. 6, p. 1136).  Defendants renewed their motion just prior to closing arguments, and the Court chose to let the case go to the jury.  (Dkt. # 239, Trial Tr. Vol. 8, p.1571).  Defendants' post-judgment renewal of their Motion is thus appropriate.  See Fed. R. Civ. P. 50(b).

### 2.    *Standard for Judgment as a Matter of Law*

Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a). "When reviewing a jury verdict, '[j]udgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party.'"  EEOC v. Harbert-Yeargin, Inc., 266 F.3d 498, 504 (6th Cir. 2001) (quoting Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1078 (6th Cir. 1999)).

In evaluating a motion for judgment as a matter of law, the court does not "weigh the evidence, evaluate the credibility of the witnesses, or substitute our judgment for that of the jury."  Harbert-Yeargin, 266 F.3d at 510 (quoting Black v. Zaring Homes, Inc., 104 F.3d 822, 825 (6th Cir. 1997).  Rather, the evidence is viewed in the light most favorable to the nonmoving party and the court must determine whether it was sufficient to raise a genuine issue of material fact for the jury.  Id.

### 3.    *Law and Argument*

#### a.    **Waiver of unjust enrichment damages**

Defendants first argue that Plaintiffs waived their right to pursue unjust enrichment damages by failing to indicate any intent to pursue such damages in the Pretrial Statement required by the Court's Trial Order.  Defendants note that, while Plaintiffs' Pretrial Statement was lengthy and detailed, it does not mention unjust

3

enrichment damages.  Rather, Plaintiffs state only that they "seek their lost profits under O.R.C. Ann. 1333.63." (Dkt. # 191 at 1).

At first glance, there is some merit to Defendants' argument.  The Court's Trial Order required Plaintiff to provide "a narrative statement listing all facts proposed to be proved by them at trial in support of their claim(s) as to liability and damages."  (Dkt. # 160 at 1(b)(1)).  The Trial Order further advised the parties that "[a] failure to set forth specific facts in support of a claim…shall constitute a waiver of such claim."  (Dkt. # 160 at 1(b)(1)).  Plaintiffs failed to make any reference to an unjust enrichment theory of damages in their Pretrial Statement.

Plaintiffs did, however, comply with the Trial Order in providing "all *facts* proposed to be proved by them *in support* of their claim(s) as to liability and damages." (Dkt. # 160 at 1(b)(1)) (emphasis added).  Even now, Defendants do not allege that Plaintiffs presented *facts* at trial that were not presented in the Pretrial Statement, but that the evidence presented regarding such facts cannot support an award of unjust enrichment damages.  Conversely, Plaintiffs stand on the assertion that the evidence they presented was sufficient for an award of unjust enrichment.  Thus, rather than whether Plaintiffs waived the right to pursue an unjust enrichment theory of damages, the more appropriate question is whether the evidence Plaintiffs presented could have provided a reasonable basis for the jury's award of such damages.

The Court recognizes that the question of waiver is a close call.  Nevertheless, because Plaintiffs did provide all facts they intended to prove at trial to support their

damages, the Court finds that they did not waive their right to pursue a theory of unjust enrichment.

### b.       Reasonable basis for unjust enrichment damages

Defendants' more substantive argument is that judgment as a matter of law is appropriate because the evidence presented by Plaintiffs provides no reasonable basis upon which a jury could have awarded unjust enrichment damages.  Thus, according to Defendants, any such award could only have been the result of improper speculation by the jury.  Plaintiffs assert that the evidence they presented at trial was sufficient to support an award of damages either under a lost profits theory or an unjust enrichment theory.

A plaintiff "bears the burden of proving the nature and extent of his damages in order to be entitled to compensation."  Akro-Plastics v. Drake Industries, 685 N.E.2d 246, 250 (Ohio App. 11 Dist. 1996).  "Damages cannot be speculative, but this only means that the *fact* of damages, not their amount, cannot be uncertain."  Pfahler v. Nat'l Latex Products Co., 517 F.3d 816, 837 (6th Cir. 2007).  Thus, where a jury's award of damages can be supported by evidence relevant to the damages theory upon which it is based, the award should be upheld.

In the instant matter, Plaintiffs argue that they offered a "modified or hybrid damage theory," which allowed the jury to base its award either on lost profits or unjust enrichment.  (Dkt. # 275 at 8; Dkt. # 231, Trial Tr. Vol. 5, pp. 975-76).  They further contend that "there is nothing which would have prevented the jury from considering the

evidence in Allied's lost profits calculation and converting it into an unjust enrichment award."  (Dkt. # 275 at 9).  Both of these assertions are flawed.

First, despite Plaintiffs' term for it, there is nothing "hybrid" about their damage theory.  As Plaintiffs' counsel describes it, they "first took into account the tools sold by Genesis and then applied Allied's profit margin of 35%."  (Dkt. # 275 at 8).  This is simply a lost profits calculation based upon Plaintiffs' assumption of a two-competitor market for the tools at issue.  By Plaintiffs' own description, this calculation does not include Genesis' profits from sales of the LXP.  Rather, it simply attempts to show the profits Allied would have made if it had sold an MT for every LXP or Versi Pro sold by Genesis.

Second, the assertion that the jury could have accepted Plaintiffs' lost profits calculation and simply "converted" it to unjust enrichment ignores the fact that lost profits and unjust enrichment are two distinct damage theories.[1]  A lost profits theory of damages is intended to compensate a plaintiff for the profits he would have received absent the defendant's unlawful conduct.  Chavez Properties-Airport Parking Albuquerque, LM v. Lorentzen, 204 F.App'x 745, 757 (10th Cir. 2006) ("Lost profits are, by their definition, the receipts or income one would receive after expenses are deducted.").  By contrast, unjust enrichment damages force the defendant to disgorge the

---

[1]    Counsel for Plaintiffs noted this distinction when addressing the issue of unjust enrichment damages during closing arguments.  Counsel stated to the jury:

> In addition, the law recognizes not only a lost profits measure, which is the measure Mr. Gleason proposed in his expert report totaling $8.6 million, but the law provides, and this court will so instruct you, that an alternate measure of damages is unjust enrichment.
> We're not going to look at the profit Allied was deprived of, let's look at the profit that Genesis gained by virtue of the stolen information.

(Dkt. # 240, Trial Tr. Vol. 9, p. 1614).

benefit he has received through his wrongful conduct.  Accordingly, unjust enrichment damages may not be based upon a plaintiff's own lost profits.  <u>Incase Inc. v. Timex Corp.</u>, 488 F.3d 46, 54 (1st Cir. 2007).

To be entitled to unjust enrichment damages, therefore, Plaintiff was required to present evidence by which the jury could reasonably find that Genesis received a benefit by the misappropriation of Allied's trade secrets and calculate that benefit.  The Court thus gave the following instruction, proposed by Plaintiffs, to the jury:

> "Unjust enrichment" means the value to the Defendants of the trade secrets resulting from the misappropriation.  In determining this value, you may consider the value:
>
> (1)    to the Defendant of the secret at the time of misappropriation, such as what a reasonably prudent investor would have paid for the trade secret;
>
> (2)    derived from savings because of increased productivity; or
>
> (3)    derived from savings in research costs.
>
> Again, such damages cannot be remote, uncertain or speculative.

(Dkt. # 240, Trial Tr. Vol. 9, pp. 1680-81).

Plaintiffs did not present evidence upon which the jury could find or calculate damages related to any of the three listed considerations for unjust enrichment damages. Indeed, in their response to Defendant's Motion for JMOL, Plaintiffs do not argue that the damages awarded by the jury could have been based upon any one of these factors. Instead, they contend that the award could have been based upon either Allied's own lost profits or upon evidence they presented as to Genesis' profits from sales of the LXP and Versa Pro.  It is true that profits earned by a misappropriating party from the stolen trade

7

secrets are a valid measure of unjust enrichment damages.  See University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 536 (5th Cir. 1974).  As with any measure of damages, however, unjust enrichment based upon profits earned as a result of misappropriated trade secrets must be supported by evidence of such profits.

It is clear from both the trial record and the record of the instant matter as a whole that Plaintiffs focused on a lost profits theory of damages.  All references to damages in Plaintiffs' Pretrial Statement indicate their intent to pursue lost profits, with no mention of unjust enrichment.  (Dkt. # 191 at 1, ¶ 159).  Likewise, the parties' Joint Preliminary Statement makes no reference to unjust enrichment, but states only that "Allied further alleges that as a result of the Defendants' misappropriation, Allied suffered damages in the form of lost profits on its multi-purpose tool."  (Dkt. # 206 at 2).

At trial, Plaintiffs' damages witnesses all testified as to a lost profits theory.  None of these witnesses gave any testimony regarding Genesis' costs or profits.  Moreover, there was no testimony as to what, if any, portion of Genesis' LXP/Versa Pro revenue came from having Allied's trade secrets as opposed to other independent factors.  Put simply, Plaintiffs aggressively pursued their lost profits theory, but presented no evidence which would give the jury a principled way to find that Genesis received a benefit from having the trade secrets, much less a manner in which to calculate any such benefit.

On direct examination, Mark Gleason, a certified public accountant retained by Plaintiffs for the instant litigation, testified that he performed only a lost profits analysis and that he deemed lost profits the proper measure of damages.  (Dkt. # 232, Trial Tr. Vol 6, p. 1044).  All of Mr. Gleason's calculations as to price, cost, and profit were based

upon Allied's numbers. (Dkt. # 232, Trial Tr. Vol 6, pp. 1050-51). Mr. Gleason stated on cross-examination that, though he had seen Genesis' profit margins per product, he could not recall them. (Dkt. # 232, Trial Tr. Vol 6, pp. 1116-17). He further explained that, compared to Genesis, Allied had a "very different approach" to manufacturing and selling its products. (Dkt. # 232, Trial Tr. Vol 6, pp. 1054-60).

Tom Anness, a certified public accountant who has served as Allied's principal accountant since the 1970s, testified that he had supplied much of the information to be analyzed by Mr. Gleason. (Dkt. # 232, Trial Tr. Vol 6, pp. 1000-01). Mr. Anness testified that, in providing that information, he was asked to calculate the costs of manufacturing each model of the Allied MT. (Dkt. # 232, Trial Tr. Vol 6, p. 1001). At no point did Mr. Anness offer any information as to Genesis' costs or profits related to the LXP or Versi Pro. On cross-examination, he stated that he was not familiar with Genesis' operations. (Dkt. # 232, Trial Tr. Vol 6, p. 1029).

Finally, Ron Karani, Plaintiffs' liability expert, testified on direct examination that he concluded that the information Plaintiffs alleged to be trade secrets had "enormous economic value to Allied." (Dkt. # 231, Trial Tr. Vol. 5, p. 798). Mr. Karani did not testify as to the value of the information to Genesis or to a competitor of Allied generally. Nor did he quantify the "enormous economic value" or give a basis for his conclusion so that the jury could use it in determining the value of the trade secrets to Allied or anyone else. Even taken in the light most favorable to Plaintiffs, Mr. Karani's testimony provided no information relevant to determining whether Genesis was unjustly enriched by possessing Allied's trade secrets.

Plaintiffs point to a single document, Plaintiffs' Exhibit 95, as evidence upon which the jury could reasonably have based its unjust enrichment award. (Dkt. # 275 at 8-9). This document, a 2006 Genesis budget created by Genesis controller James Bendas, listed a profit margin of 23% for the Genesis LXP. Defendants argue that this was an estimated profit margin used for budgeting purposes for 2006 only and that it cannot support an award of unjust enrichment damages based upon Genesis' actual profits over the several years in question. Plaintiffs respond that Bruce Bacon, the former vice-president and general manager of Genesis, "admitted [that] this document confirmed that the gross margin on the LXP was 23%." (Dkt. # 275 at 8). They further assert that even if Exhibit 95 is an estimated budget, it can still be used to support the unjust enrichment award.

First, Plaintiffs plainly misconstrue the testimony of Mr. Bacon regarding Exhibit 95. Rather than confirming that it represented actual profit margins, Mr. Bacon clearly stated that the 23% profit margin reflected in Exhibit 95 was a controller's estimate for budgeting purposes. He testified as follows:

> Q.   I just want to show the jury. This is a budget report. This is Plaintiff's [95] prepared by Mr. Bendas. And I am going to show you, on the final page, Genesis 52653, does Mr. Bendas -- I am going to laser right in on it -- say, "The LXP, Gadget and Grapples have gross profits of 23 percent," so do you see the LXP has a 23 percent gross margin?
>
> A.   That's what he's estimating in the controller's comments, yes.
>
> Q.   Now, were you here yesterday to hear Mr. Anness advise, or Mr. Gleason, that the gross margin of the MT was in the 30 percent range?

10

A.    Yes. I am not certain he ever identified what it was.  I don't think he knew.

Q.    Now, it would make sense for the Genesis gross margin to be a little lower, because you discount greatly the prices that you give for sales to distributors, correct?  You knock off about 15 or 20 percent?

A.    Yes, sir.

Q.    So if you are knocking off 15 or 20 percent off the sales price, that's going to reduce your margin, and hence, you end up at or around 23 percent, correct?

A.    Yes, but there's more to that story. That should be -- that I should testify to.  These are controller's comments, and they are estimates, and they may or may not reflect what happens in reality. Sometimes things cost more to build than you anticipate. Sometimes the selling price is lower or higher than you anticipate.

(Dkt. # 236, Trial Tr. Vol. 7, pp. 1259-61).

Next, Plaintiffs are incorrect in asserting that unjust enrichment damages may be based upon Genesis' estimated profit margin on the LXP for 2006.  "Normally only the defendant's actual profits can be used as a measure of damages in cases where profits can be proved, and the defendant is normally not assessed damages on wholly speculative expectations of profits."  Lykes-Youngstown, 504 F.2d at 536.  Plaintiffs' Exhibit 95 contains only a projected profit on a single Genesis model for a single year.  Therefore, it cannot reasonably be used to show the existence or amount of any unjust enrichment actually gained by Genesis as a result of the misappropriation of Allied's trade secrets on multiple models over a several-year period.

Plaintiffs dispute the validity of Lykes-Youngstown in precluding the use of projected profits to calculate damages.  They point out that the court also noted that "the

11

lack of actual profits does not insulate the defendants from being obliged to pay for what they have wrongfully obtained in the mistaken belief their theft would benefit them." Id. In so stating, however, the court was addressing those cases in which a defendant misappropriated trade secrets but failed to turn a profit from their use, such that it is impossible to award damages based upon the defendant's profits. The court explained that, in such cases, an alternate, but more uncertain, measure of damages is a reasonable royalty. Id. Plaintiffs in the instant matter clearly do not contend that Genesis failed to profit from the use of Allied's trade secrets, so there is no reason to move to more speculative measures of damages.

The only testimony regarding the 23% figure listed in Exhibit 95 is that of Mr. Bacon, who clearly indicated that the document reflected the controller's estimated margin on the LXP for budgeting purposes in 2006. Plaintiffs do not cite, and the Court is not aware of, any trade secret or patent case in which a defendant's projected profits have been used as a measure of unjust enrichment damages. Rather, as noted by the court in Lykes-Youngstown, these speculative figures are sometimes used in calculating a reasonable royalty where the actual value of the benefit to the defendant is not ascertainable. See Hughes Tool Co. v. Dresser Industries, Inc., 816 F.2d 1549, 1556-58 (Fed. Cir. 1987) (reviewing reasonableness of royalty based upon patent infringer's projected profits from infringing use); Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009). Even in such cases, however, the calculation of damages requires more than the projected profit figure alone in order to determine the damages arising specifically from the defendant's wrongful conduct. See. Lucent

Technologies, 580 F.3d at 1324 (citations omitted) (noting the methodology used to calculate a reasonable royalty based upon infringer's projected profits).

Defendants also point to a question from the jury as an indication that their unjust enrichment award was the result of speculation.  Approximately four hours into their deliberations, the jury submitted a question, in writing, to the Court.  The question read,

> If we say "yes" to [Interrogatory] Number 4, is there a way to base the dollar amount of unjust enrichment to the Defendants proximately caused by the misappropriation of trade secrets?

(Dkt. # 240, Trial Tr. Vol. 9, pp. 1695-96).  The Court instructed the jury that it had all the evidence before it and should rely on it in making a decision.  (Dkt. # 240, Trial Tr. Vol. 9, pp. 1695-96).  Approximately thirty minutes later, the jury presented its verdict to the Court.  (Dkt. # 240, Trial Tr. Vol. 9, p. 1696).

The Court agrees that the jury's question could be indicative of the lack of a principled method of calculating the unjust enrichment damages or the absence of evidence which would allow the jury to make such a calculation, both issues the Court has already discussed.  The precise reason for the question, however, cannot be ascertained, and any attempt to do so would be speculative.  See Salvatore v. Findley, 2008 WL 2588547, *5-6 (Ohio App. 10 Dist. 2008).  Thus, while the Court recognizes the possible implications of the question, it gives it little weight in determining the merits of Defendants' Motion for Judgment as a Matter of Law.

Because the Court finds that Plaintiffs failed to present any evidence upon which the jury could reasonably have found the existence or amount of unjust enrichment

13

damages, Defendants are entitled to judgment as a matter of law with respect to unjust enrichment damages.

### c.  Evidence of Misappropriation

Defendants next argue that Plaintiffs "failed to present substantial evidence of an actual trade secret that was actually misappropriated." (Dkt. # 264-1 at 10).  Essentially, Defendants contend that they are entitled to judgment as a matter of law on the issue of misappropriation because no reasonable jury could have found, based upon the evidence presented, that Allied possessed a trade secret and that Defendants misappropriated such trade secret.  Plaintiffs contend that the evidence was sufficient for the jury to make both findings.

Though largely circumstantial, Plaintiffs presented evidence as to each element of a claim for misappropriation of trade secrets: "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; (3) the unauthorized use of a trade secret." Heartland Home Finance, Inc. v. Allied Home Mortgage Capital Corp., 258 F. App'x 860, 861 (6th Cir. 2008) (citing Hoover Transpl. Servs. v. Frye, 77 F. App'x 776, 782 (6th Cir. 2003) (per curiam)).  Based upon such evidence, the jury found that Plaintiffs proved their misappropriation claim.  It cannot be said that there was "a complete absence of fact to support the verdict," such that Defendants are entitled to judgment as a matter of law.  Harbert-Yeargin, 266 F.3d at 504.  Defendants' arguments to the contrary, many of which were already rejected by the Court at the summary judgment phase, are unavailing.

14

As the parties' respective briefs demonstrate, the issue of misappropriation is a question of fact that involves weighing the large amount of evidence presented at trial. Such an undertaking is inappropriate on a Motion for Judgment as a Matter of Law.  Id. at 510.  Viewed in the light most favorable to Plaintiffs, the evidence was sufficient to raise a genuine issue of fact for the jury.  Therefore, Defendants are not entitled to judgment as a matter of law on the issue of misappropriation.

### 4.     *Conclusion*

For the foregoing reasons, Defendants' Motion for Judgment as a Matter of Law is hereby **GRANTED in part** and **DENIED in part**.  (Dkt. # 264).  The Motion is GRANTED with respect to damages for unjust enrichment.  The jury's award of unjust enrichment damages shall be vacated.  The Motion is DENIED as to the issue of liability for misappropriation.

In light of the foregoing, Defendants' Motion to Stay Enforcement of Judgment is hereby **DENIED as MOOT**.  (Dkt. # 248).

### B.     **Defendants' Alternative Motion for New Trial**

Pursuant to Rule 50(c), "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed."  In doing so, "[t]he court must state the grounds for conditionally granting or denying the motion for a new trial."  Fed. R. Civ. P. 50(c)(1).

15

### 1.  *Standard for New Trial*

Rule 59(a) provides, in pertinent part, that the Court may grant a new trial as to some or all issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "[A] new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias."  Holmes v. City of Massillon, 78 F.3d 1041, 1045-46 (6th Cir. 1996).  A motion for new trial will not be granted unless the moving party demonstrates that he suffered prejudice as a result of trial errors, such that "failure to grant a new trial is inconsistent with substantial justice."  Erskine v. Consolidated Rail Corp., 814 F.2d 266, 272 (6th Cir. 1987).

### 2.  *Law and Argument*

#### a.  **Admission of evidence**

Defendants first argue that a new trial is warranted because the Court erred in admitting evidence of Defendant Mark Ramun's ("Mark") relationship with A-Ward Attachments.  Such evidence included the deposition testimony of Simon Ward ("Ward"), managing director of A-Ward Attachments, and an e-mail sent by Mark to Ward.  (Dkt. # 264-1 at 25).  Defendants contend that these items were "irrelevant, highly prejudicial character evidence."  (Dkt. # 264-1 at 25).

"Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a

16

different outcome at trial." <u>Morales v. Am. Honda Motor Co.</u>, 151 F.3d 500, 514 (6th Cir. 1998); <u>see</u> <u>also</u> Fed. R. Civ. P. 61.  Thus, to prevail on a motion for new trial based upon an evidentiary ruling, the moving party must show that a different ruling would have produced a different verdict at trial.  Defendants have failed to make such a showing on either item of evidence they cite.

### 1.    E-mail

First, with respect to the e-mail sent by Mark to Ward, Defendants allege that it was improperly introduced by Plaintiffs "solely to misrepresent Mark's actions to the jury."  (DKt. # 264-1 at 26).  Mark's testimony indicated that attached to the e-mail were 14 patents Mark had collected during his tenure with Allied.  (Dkt. # 230, Trial Tr. Vol. 4, pp. 587-88).  The message contained a discussion of the patents, in which Mark advised that Ward should review the patents before finalizing any design plans and stated that Ward owed him for the information.  (Dkt. # 230, Trial Tr. Vol. 4, pp. 588-89).  Mark admitted that he signed the e-mail, "Mark – the spy, the thief, the man."  (Dkt. # 230, Trial Tr. Vol. 4, pp. 589).

Defendants assert that this evidence should have been excluded because it was inadmissible character evidence and because Plaintiffs made "manipulative use of [Mark] Ramun's innocent statement."  (Dkt. # 264-1 at 26).  Specifically, Defendants contend that "[a]s common sense dictates, and as [Mark] Ramun explained in depositions and at trial, the statement was a sarcastic joke."  (Dkt. # 264-1 at 26).  According to Defendants, "[a]llowing the jury to think otherwise is, itself, justification for a new trial."  (Dkt. # 264-1 at 26).

Evidence of a person's character is inadmissible to show conformity with such character on a particular occasion.  Fed. R. Evid. 404(a).  Rule 404(b) of the Federal Rules of Evidence sets forth the circumstances under which evidence of prior bad acts may be admissible for a purpose other than to prove character, such as to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).

As Defendants note, the Court did not admit the e-mail itself into evidence.  The Court did, however, permit Plaintiffs' counsel on cross-examination to question Mark about the statement in the e-mail and ruled that the e-mail document would not be admitted except for impeachment purposes in the event he denied making the statement.  (Dkt. # 230, Trial Tr. Vol. 4, pp. 520-22).  The Court explained that if Mark admitted making the statement in the e-mail, the document itself would merely be cumulative of a fact already in evidence.  (Dkt. # 230, Trial Tr. Vol. 4, pp. 521-22).

The Court finds that there was no error in this ruling.  The substance of the e-mail was admissible under Rule 404(b) as proof of Mark Ramun's opportunity to provide Genesis with certain information he had obtained during his time at Allied.  Taken together, the discussion in the e-mail, the 14 attached patents, and the signature "Mark – the spy, the thief, the man," could be interpreted as evidence that Mark Ramun possessed ill-gotten information, which is a prerequisite to having the opportunity to provide such information to Genesis.

Even if the evidence of the e-mail should have been excluded, however, Defendants have failed to show sufficient prejudice to warrant a new trial.  Defendants

18

did not contest the fact that Mark possessed the information alleged by Plaintiffs.  Thus, it was only minimally prejudicial, if at all, for the jury to hear evidence of such possession.  Additionally, defense counsel had ample opportunity to question Mark about the e-mail in order to rehabilitate any damage done on cross-examination.[2]  (Dkt. # 230, Trial Tr. Vol. 4, pp. 710-12, 716).  As Defendants argue, Mark testified that the signature on the e-mail was intended "in a joking manner."  (Dkt. # 230, Trial Tr. Vol. 4, p. 716).  While the statement is not inadmissible on the ground that it may have been intended as sarcasm, if Defendants' assertion that "common sense dictates" such an interpretation is taken as true, then the jurors' use of common sense reduces any danger of prejudice.  In any event, Defendants have failed to show that the result of the trial would have been different if the Court had precluded Plaintiffs from questioning Mark about the e-mail.

Defendants also argue that a new trial is warranted because counsel for Plaintiffs displayed the e-mail document to the jury despite the fact that it was not admitted into evidence and in violation of the Court's ruling on the document's admissibility.  (Dkt. # 264-1 at 26).  The record shows that the document was displayed to the jury for no more than 30 seconds.  (Dkt. # 230, Trial Tr. Vol. 4, p. 587).  Defense counsel immediately objected and the document was taken off of the screen.  The Court then made clear to Plaintiffs' counsel that he had violated the Court's ruling on the admissibility of the document.  (Dkt. # 230, Trial Tr. Vol. 4, p. 587).

Though the e-mail was improperly shown to the jury, Defendants were not significantly prejudiced by the display.  The reason the Court excluded the document was

---

[2]        Because Mark Ramun was called during the presentation of Plaintiffs' case, his direct examination by defense counsel followed cross-examination by Plaintiffs' counsel.

because, as long as Mark admitted the statements he made in it, the document itself was cumulative of facts already in evidence. (Dkt. # 230, Trial Tr. Vol. 4, pp. 520-22). Exclusion was not based upon relevance, undue prejudice, or Rule 404(b) concerns. Thus, the displaying of the e-mail to the jury did no more than show, for a brief period of time, the statements which Mark admitted making during his testimony. As the Court has already determined, the admission of the substance of the e-mail was neither error under Rule 404(b), nor, in any event, sufficiently prejudicial to warrant a new trial. The brief display of the e-mail to the jury did not so increase the prejudice to Defendants that a new trial is necessary.

## 2.    *Simon Ward Deposition*

Defendants also argue that the deposition testimony of Simon Ward should have been excluded "because it did not meet the requirements of Rule 804(b)(1) and violated Rules 402, 403, and 404(b)." (Dkt. # 264-1 at 26). They contend that the deposition testimony was not probative of state of mind or intent and was unduly cumulative as to opportunity, knowledge, and possession of information. (Dkt. # 264-1 at 26-27).

The Court finds that the deposition testimony was properly admitted. The Court gave the following limiting instruction regarding such evidence:

> Ladies and gentlemen of the jury, the Simon Ward testimony that Mark Ramun displayed on his laptop, certain information regarding Allied-Gator, may not be considered as evidence that Mark Ramun disclosed or misappropriated trade secrets in this case before you.
> However, you may use this evidence that Mark Ramun had knowledge and possession of information regarding Allied's products.
> It may also be considered by you to show opportunity.

One other point, no one can look into the mind of another, and this evidence may be considered by you in determining the Defendant's state of mind, intent or motive, but not for any other purpose.

(Dkt. # 231, Trial Tr. Vol. 5, p. 796).  Based upon the instruction, it is clear that the deposition testimony was admitted for permissible purposes under Rule 404(b).  The Court properly instructed the jury that it could not consider the testimony as evidence that Mark provided trade secrets to Genesis.  Furthermore, the evidence was relevant as to Mark's possession of confidential information, as well as his opportunity and intent to share such information with third parties.

The deposition testimony was also admissible under Rule 804(b)(1).  Under the rule, prior testimony is admissible if the party against whom it is being offered "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."  Fed. R. Evid. 804(b)(1).  Defendants clearly had an opportunity to cross-examine Ward at the time of the deposition, and that cross-examination was read into evidence at trial.  (Dkt. # 231, Trial Tr. Vol. 5, pp. 782-96).  In their Motion for New Trial, however, Defendants argue that they "were unfairly prejudiced by [Ward's] biased testimony," because they were precluded at the deposition from cross-examining Ward regarding the lawsuit he was pursuing at the time against Mark Ramun and Genesis, which Defendants allege gave Ward "his own motives to provide testimony."  (Dkt. # 264-1 at 27 n.16).

Defendants' argument is unavailing.  The portion of Ward's testimony to which Defendants object is that regarding a meeting between Ward, Mark, and Richard Currie ("Currie") in Ward's New Jersey apartment in 2003.  At trial, however, Mark largely

21

confirmed Ward's account of the meeting.  Ward testified at his deposition that at the meeting, Mark attempted to show him and Currie a presentation Mark had prepared during the time he worked at Allied in order to help familiarize Currie with the attachments market.  (Dkt. # 231, Trial Tr. Vol. 5, pp. 776-80).  The presentation allegedly showed information regarding the Allied MT, as well as a moving drawing illustrating the power curve of a particular tool.  (Dkt. # 231, Trial Tr. Vol. 5, pp. 776-80, 783-84).  Ward testified that, once he realized what the presentation was, he declined to look at it because he was concerned about being sued by John Ramun.  (Dkt. # 231, Trial Tr. Vol. 5, pp. 778-79, 781).

At trial, Mark Ramun testified regarding this meeting.  On cross-examination, he confirmed that the meeting had taken place and that he remembered bringing his laptop computer to Ward's apartment.  (Dkt. # 230, Trial Tr. Vol. 4, p. 585).  Mark stated that he did not recall showing Ward and Currie the Allied presentation.  (Dkt. # 230, Trial Tr. Vol. 4, p. 585-86).  On direct examination, Mark testified that he recalled showing Currie some Allied files at the meeting in order to help educate him as a salesman new to the attachments industry.  (Dkt. # 230, Trial Tr. Vol. 4, pp. 708-09).  After being shown Exhibit 382 to refresh his recollection, Mark identified certain portions of the Allied presentation which he showed to Currie.  (Dkt. # 230, Trial Tr. Vol. 4, pp. 708-09).  He further stated, "We may have looked at a moving drawing that was a working model program that ran a shear cycle, open, close, open.  And it also illustrated at the very same time where, with a dot, the power would be on a graph."  (Dkt. # 230, Trial Tr. Vol. 4, p. 709).

Thus, Defendants' complaints regarding the limitations on their cross-examination of Ward as to his motives for his testimony are largely overshadowed by Mark's corroboration of such testimony. That is, Defendants cannot claim prejudice in their inability to cast doubt upon Ward's account of the New Jersey meeting when Mark's testimony confirmed that Ward's account was accurate. Accordingly, any limits on Defendants' cross-examination of Ward were not sufficient to preclude the admission of his deposition testimony under Rule 804(b). Defendants are not entitled to a new trial on such grounds.

### b.    Confidentiality of Allied MT manuals

Defendants next argue that the Court erred in ruling that the Allied MT Owners' and Operators' Manuals were confidential as a matter of law. They contend that it was properly a question of fact for the jury whether Allied made sufficient efforts to keep such materials confidential. (Dkt. # 264-1 at 27).

The Court decided this issue at the summary judgment phase. There, the Court stated:

> Defendants' disclosure argument with respect to the Allied MT Owner's Manual must fail because the Owner's Manual is a confidential document that is not publicly available. In the manufacturing industry, manufacturers typically provide owner's manuals to customers to aid customers in the maintenance and repair of the products they have purchased. (Dkt. # 129, at 41.) Allied claims that a purchaser of the Allied MT is under a legal duty to maintain the confidentiality of the information set forth in the Owner's Manual. The confidential drawings contained within Allied's Owner's Manual specifically state that "this drawing and all information thereon is the sole property of Allied. It is loaned confidentially with the clear understanding that it will not be copied, will be returned upon request and will not be used directly or indirectly in any way detrimental to our interest." (Dkt. # 129, at 41.) Because the Allied MT Owner's Manual is

23

> not publicly disclosed, Defendants cannot avoid liability by alleging that the Owner's Manual discloses Allied's trade secrets.

(Dkt. # 152 at 19).

When the issue was raised at trial during cross-examination of Plaintiff John Ramun, a side-bar conference was conducted. The Court noted Defendants' objections, but confirmed its prior ruling on the confidentiality of the owners' manuals. (Dkt. # 225, Trial Tr. Vol. 2, pp. 256-58). Before sending the case to the jury, the Court gave the following instruction:

> Allied's manuals have been determined by this court as a matter of law to be a limited, confidential disclosure. Therefore, if something is a trade secret, the fact that it appears in the owner's manual does not take away its trade secret status.
> However, items or drawings contained in the owner's manual, even though confidential, are not automatically trade secrets.

(Dkt. # 240, Trial Tr. Vol. 9, p. 1676).

Defendants have offered no new basis for their argument that the Allied MT owners' manuals are not confidential as a matter of law. For the reasons stated in the Court's Memorandum Opinion and Order on Defendants' Motion for Summary Judgment, and consistent with its ruling at trial and its instruction to the jury, the Court finds that the owners' manuals were properly deemed confidential as a matter of law. Defendants are not entitled to a new trial on this ground.

### c.    Jury instructions

Defendants argue that two interrogatories submitted to the jury as part of the verdict form "confused, misled, and prejudiced the jury against all Defendants." (Dkt. # 264-1 at 28-29). Specifically, Defendants argue that Interrogatory 1 failed to limit the

scope of information possessed by Mark Ramun which could have contained trade secrets.  Also, they argue that Interrogatory 2 failed to require a finding of causation for misappropriation as to each Defendant.

Jury instructions and interrogatories are reviewed "as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." Arban v. West Publishing Corp., 345 F.3d 390, 404 (6th Cir. 2003).  A party is not entitled to a new trial based upon the wording of an interrogatory as long as the interrogatory, taken together with the instructions, "leaves the reader with a sense of what the Court was asking."  Brown v. Tennessee Gas Pipeline Co., 623 F.2d 450, 453 (6th Cir. 1980).

In the instant matter, the Court submitted to the jury a series of five interrogatories which the jury was required to complete in order to arrive at its general verdict for either Plaintiffs or Defendants.  (Dkt. # 242).  Interrogatory 1 asked, "Do you find unanimously that Allied has proven by a preponderance of the evidence that any of the information Mark Ramun possessed contained trade secrets as that term has been defined for you?" Interrogatory 2 then asked, "If you have identified any items as trade secrets in response to Interrogatory No. 1 above, do you find unanimously that Allied has proven by a preponderance of the evidence that the Defendants misappropriated trade secrets?"  (Dkt. # 242).

Defendants argue that the wording of Interrogatory 1 failed to ensure that liability was based only on information that was a trade secret when Mark Ramun was hired by Genesis in August 2003.  Additionally, they contend that the failure to require the jury to

identify a particular trade secret "allowed the jury to avoid a unanimous finding as to any particular trade secret."  (Dkt. # 264-1 at 28).

Neither argument is persuasive.  The danger that the jury "may have found the Defendants liable for using information that had lost trade secret status by August 2003," (Dkt. # 264-1 at 28), is minimized by the Court's clear instruction on the definitions of the terms "trade secret" and "misappropriation" under Ohio law, and by reading Interrogatory 1 in conjunction with Interrogatory 2.  An affirmative answer to Interrogatory 2 requires a finding that the information for which Defendants are liable was a trade secret in August 2003.  That is, even if the scope of information included in Interrogatory 1 was too broad, Interrogatory 2 narrowed that scope because Genesis could not have misappropriated a trade secret provided by Mark Ramun if he did not possess a trade secret at the time he was hired by Genesis.  Put another way, if the jury answered "Yes" to Interrogatory 1 based solely upon information that had lost trade secret status by August 2003, it would have had to answer "No" to Interrogatory 2 because there would have been no trade secret left for Genesis to misappropriate at the time Mark Ramun was hired.

Defendants provide no support for the argument that Interrogatory 1 was erroneous because it did not require the jury to identify unanimously a particular trade secret.[3]  Moreover, in its instructions to the jury, the Court limited the information that could be determined to be a trade secret, stating:

---

[3]     The case Defendants cite, O2 Micro International Ltd. v. Monolithic Power Systems, Inc., 399 F. Supp.2d 1064 (N.D. Cal. 2005), is inapposite.  There, the court vacated an award of unjust enrichment damages because the plaintiff based its damage calculation on the misappropriation of 12 trade secrets together and

To prove its claim, Allied must prove either that:

(1) the five features of the main shaft assembly of the Allied MT, including (a) the fit of the knife and main shaft, (b) the one piece extended main shaft, (c) use/location of thrust bearing, (d) sealed bearing cavities free of contamination, or (e) main shaft retention/arrangement; or

(2) Allied's business plan, including (a) engineering data, (b) cost data, or (c) production/scheduling information are trade secrets that were misappropriated.

(Dkt. # 240, Trial Tr. Vol. 9, p. 1670). Therefore, by answering "Yes" to Interrogatory 1, the jury was necessarily indicating that it found at least one of the above items to have been a trade secret. Reading the instructions as a whole, the Court finds that it was not necessary to have required the jury to identify a specific trade secret as part of Interrogatory 1.

Defendants next argue that Interrogatory 2 "is flawed because it does not require the jury to assess Allied's allegations of causation as to each Defendant." (Dkt. # 264-1 at 29). As Plaintiffs note, liability for misappropriation of trade secrets, an intentional tort, is joint and several under Ohio law. O.R.C. § 2307.22(A)(3). Thus, any apportionment of causation between Defendants would have had no effect on the jury's verdict. The Court's instructions clearly advised the jury as to the findings necessary to impose liability for misappropriation upon any Defendant. See (Dkt. # 240, Trial Tr. Vol. 9 at pp. 1677-78). Defendants' proposed amendment to Interrogatory 2 to require apportionment of causation was unnecessary.

Accordingly, Defendants are not entitled to a new trial based upon the Court's instructions to the jury.

---

failed to provide damage figures for each individual trade secret. Id. at 1076-77. When the jury found only five trade secrets to have been misappropriated, there was no evidence upon which the damage award could have been based.

### d.    Expert testimony

Next, Defendants assert that the testimony of Plaintiffs' experts Ron Karani and Mark Gleason should have been excluded under Rule 702 because it lacked foundation and was speculative.  Defendants do not specify which portions of the experts' testimony were objectionable.

Rule 702 permits expert testimony, including opinion testimony, if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  Generally, the underlying factual basis for a proffered expert opinion "'goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.   Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.'" Bonner v. ISP Tech., Inc., 259 F.3d 924, 929–30 (8th Cir. 2001).

The Court denied a motion in limine to strike the expert report and preclude the testimony of Mr. Karani, finding that his opinions and conclusions showed the proper foundation and were not vague or conclusory.  (Dkt. # 151).  Neither the trial proceedings nor Defendants' present arguments have provided a basis for the Court to reconsider that ruling.

The Court also preliminarily denied a motion in limine to strike the testimony of Mr. Gleason, subject to renewal at trial.  (Dkt. # 169).  Even assuming, however, that Mr. Gleason's testimony should have been excluded at trial, Defendants have failed to

demonstrate that the admission of such testimony was sufficiently prejudicial to warrant a new trial. As the Court observed at Section I.A.3.b., *supra*, Mr. Gleason testified exclusively on a lost profits calculation of damages. The jury expressly rejected his opinions by declining to award any damages for lost profits. (Dkt. # 242). Thus, Defendants have not shown that the result of the trial would have been different if Mr. Gleason's testimony was excluded.

Therefore, Defendants are not entitled to a new trial based upon the admission of the expert testimony of Mr. Karani and Mr. Gleason.

### e.    Cumulative, Irrelevant Evidence

Defendants further claim that a new trial is warranted because they were prejudiced by the "presentation of cumulative, irrelevant evidence that should have been excluded under Rule 403." (Dkt. # 264-1 at 29). As support for this assertion, Defendants point to three types of evidence:

(1)    Cumulative and excessive references to the Vuksanovich brothers (who Allied sought to exclude from testifying);

(2)    Cumulative and excessive references to the Genesis and Allied demolition bucket products, neither of which were part of Allied's UTSA claim;

(3)    Cumulative and excessive references to the Genesis pulverizer teeth, which were not alleged to be a misappropriated trade secret.

(Dkt. # 264-1 at 29).

All of the above items are related in that Defendants object to their admission on the assertion that Plaintiffs offered such evidence to give "the jury an unfairly prejudicial impression that the Defendants were involved in 'additional misappropriation' related to pulverizer teeth, the Vuksanovich brothers and the demolition bucket." (Dkt. # 277 at

29

20).  Significantly, Defendants do not allege error in the admission of such evidence by the Court, but rather in the fact that "[m]uch of this evidence was slipped into the record when Allied's counsel flouted this Court's limiting instructions."  (Dkt. # 264-1 at 29).

The Court has reviewed the trial record with respect to the specific areas of evidence Defendants cite.  First, the Court finds that not all references to such evidence were improper or should have been excluded.  Even assuming that some of the evidence was inadmissible, however, the Court finds that Defendants have failed to show sufficient prejudice to warrant a new trial.  Specifically, there is minimal risk that any "additional misappropriation" was a factor in the jury's verdict.  The Court clearly instructed the jury as to the specific trade secrets at issue in the instant matter.  (Dkt. # 240, Trial Tr. Vol. 9, p. 1670).  Absent clear evidence to the contrary, the jury is presumed to have followed the Court's instructions and not to have based its finding of misappropriation on extraneous matters.  CSX Transportation, Inc. v. Hensley, 129 S. Ct. 2139, 2141 (2009).

Accordingly, Defendants are not entitled to a new trial on this ground.

### f.    Conduct of opposing counsel

Defendants finally contend that a new trial is warranted by the misconduct of Plaintiffs' counsel.  Specifically, Defendants point to the following conduct by opposing counsel:

(1)    References to confidential designations made in accordance with the Protective Order in pretrial discovery, despite the Court's instruction to not make such references.

(2)    Repeatedly displaying documents to the jury that contained confidentiality designations that were removed pretrial, and publishing documents to the jury before admission, or when

30

> specifically instructed by the Court not to do so (*i.e.*, deposition transcripts, A-Ward e-mail, documents concerning the demolition bucket).

(3)    Constantly leading their own witnesses.

(4)    Repeated implications that the Allied claw bucket was misappropriated by Genesis.

(Dkt. # 264-1 at 30).  Plaintiffs deny (in a footnote) that their counsel engaged in any misconduct.

The Court notes that neither Plaintiffs' nor Defendants' counsel was without incidents of inappropriate conduct during what was a contentious trial.  It is clear from the record that the Court admonished counsel for both sides on numerous occasions, prompted either by an objection or, often, *sua sponte*.  Neither counsel's conduct, however, was so prejudicial to the opposing parties that a new trial is warranted.

Defendants raise four specific areas of alleged misconduct, which the Court will address.  First, Defendants assert that Plaintiffs' counsel made repeated references to designations of confidentiality regarding certain documents and displayed such designations to the jury on various exhibits, which designations were applied according to the Protective Order issued by the Court.  While Plaintiffs' counsel did make such inappropriate references on several occasions, any resulting prejudice was cured by the Court's clear instruction to the jury on the matter:

> Finally, when looking at the exhibits, you may not consider extraneous highlighting, markings or labels, such as "confidential," or "attorneys' eyes only."  Those were meant not to be actually displayed to you.
> I saw some of the exhibits, you probably saw it, too, that same wording, "confidential" or "for attorneys' eyes only."

31

Don't consider that in determining whether a trade secret exists. These extraneous marks were made by the attorneys during their pretrial discovery and are irrelevant in your evaluation of the evidence. You must determine whether a particular item is a trade secret on the instructions that I am giving you.

(Dkt. # 240, Trial Tr. Vol. 9, pp. 1676-77).

Next, Defendants contend that Plaintiffs' counsel repeatedly published documents to the jury before they were admitted as evidence. While this is true, and counsel was appropriately admonished for doing so, the resulting prejudice was minimal. In almost every instance, the offending document was taken down after only a brief display. Moreover, the Court's instruction to the jury made clear that only those documents that were admitted by the Court may be considered as evidence. The Court stated:

Evidence in this case, of course, includes the testimony of the witnesses and the exhibits that were admitted during trial. Nothing else is evidence.

The lawyers' opening statements and closing arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence, and my comments and questions are not evidence.

The Court has determined the scope of the evidence that may be considered, and you may only consider evidence that has been admitted by this Court. Issues concerning the production of documents have already been resolved by the Court, and comments by counsel concerning the production of documents are not evidence and may not be considered in your determination of the facts.

In fact, during the trial, I didn't let you hear the answer to some of the questions that the lawyers asked, and sometimes I ordered you to disregard certain things that you saw or heard, or I struck things from the record. You must completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown.

Furthermore, you have seen charts and diagrams and other demonstrative documents that were shown to you to help explain the evidence. In other words, that is the only purpose: to help explain the evidence for you. They are not itself evidence or proof of any facts.

In summary, anything that the court instructed you to disregard is not evidence, and you are bound by your oath not to let them influence your

decision in any way. Make your decision based solely on the evidence as I have defined it here, and nothing else.

(Dkt. # 240, Trial Tr. Vol. 9, pp. 1659-61).

Defendants also assert that Plaintiffs' counsel repeatedly asked leading questions of their own witnesses on direct examination. Defendants do not point to any specific instances of such questioning, and the Court will not scour the 1,700-page trial record to find leading questions. While virtually any proceeding will contain examples of improper leading questions, it will be the rare occasion in which they provide grounds for a new trial. The Court finds, looking at the trial as a whole, that any leading questions posed by Plaintiffs' counsel were not so pervasive and egregious as to warrant a new trial.

Finally, Defendants argue that Plaintiffs' counsel made repeated implications that Genesis misappropriated the Allied claw bucket, which was not a trade secret at issue in the instant litigation. The Court has already addressed the substance of this argument at Section I.B.2.e., *supra*, and found that it does not warrant a new trial.

Therefore, Defendants are not entitled to a new trial based upon the conduct of opposing counsel.

### 3. Conclusion

For the foregoing reasons, the Court finds, pursuant to Rule 50(c), that Defendants are not entitled to a new trial based upon the grounds asserted, either individually or collectively, in their Alternative Motion for New Trial. Therefore, Defendants Alternative Motion for New Trial is hereby **DENIED**. (Dkt. # 264).

## II.  PLAINTIFFS' MOTION FOR NEW TRIAL ON LOST PROFITS AND PUNITIVE DAMAGES

Plaintiffs move for a new trial on the issues of lost profits and punitive damages. (Dkt. # 265).  The Court reiterates that a new trial is warranted only where a jury has reached a "seriously erroneous result," and the moving party shows prejudice resulting from trial errors, such that justice requires a new trial.  Holmes, 78 F.3d at 1045-46; Erskine, 814 F.2d 272.  Plaintiffs have failed to demonstrate that they are entitled to a new trial on damages.

### A.  Evidence and Jury Instructions Concerning Market Competition

Plaintiffs first allege that they are entitled to a new trial on lost profits because of the admission of evidence and an instruction to the jury regarding the presence of other competitors in the demolition attachment market to whom Allied may have lost some sales of the MT for reasons unrelated to Defendants' misappropriation.  Specifically, Plaintiffs argue that evidence of competing products in the demolition attachments market other than the Allied MT and Genesis LXP/Versi Pro should have been excluded because it was irrelevant with respect to the lost profits calculation in a trade secrets case. They further contend that the Court's jury instruction and verdict form on the issue of lost profits erroneously required the jury, in order award any damages for lost profits, to find that every sale of the Genesis LXP or Versi Pro would have gone to Allied but for Defendants' misappropriation.  Both arguments are without merit.

Plaintiffs rely on a single case from a district court of another circuit to support their argument that evidence of other competing products is irrelevant in calculating lost

profits in a trade secrets case.  In that case, <u>RRK Holding Co. v. Sears, Roebuck and Co.</u>, 563 F.Supp.2d 832 (N.D. Ill. 2008), the court denied the defendant's motion for judgment as a matter of law with respect to damages.  Despite Plaintiffs' characterization of the <u>RRK</u> holding, that case does not stand for the proposition "that the presence of other market participants, while potentially relevant in the patent context, is irrelevant to a trade secret damage calculation."  (Dkt. # 266 at 4).  Rather, with respect to the market participant argument, the <u>RRK</u> court found, without elaboration, that the patent case cited by the defendant "[did] not directly apply to the present trade secrets suit."  <u>Id.</u> at 837.  The court then determined that "it is unclear whether [the third party competitor's] tool was similar enough to constitute a 'non-infringing substitute product.'"  <u>Id.</u>  One possible implication of this finding is that if the non-misappropriated competing product was "similar enough," evidence of its presence in the market may have resulted in a different outcome.  Moreover, the <u>RRK</u> court was ruling on a defendant's motion to alter an award of lost profits, such that the defendant had the burden of showing that no reasonable jury could have found for the plaintiff.  <u>Id.</u> at 834-35.  The posture of the instant motion is just the opposite.

The Court agrees that, to prove misappropriation, a plaintiff need not show the absence of any other competing products.  In the jury's calculation of lost profits from such misappropriation, however, the definition of the applicable market is important.  Therefore, evidence as to the number of competitors is directly relevant, and is a question of fact for the jury.  That is, if a plaintiff wants a jury to award damages based upon lost profits from lost sales, he must provide evidence by which the jury can reasonably

determine which sales were lost.  A defendant, in turn, is permitted to present evidence to counter the plaintiff's market theory.

Plaintiffs also misconstrue the Court's ruling on Defendants' Motion in Limine to Preclude the Expert Testimony of Mark M. Gleason.  It citing the Court's Order denying Defendants' motion, Plaintiffs selectively quote from the April 8, 2010, opinion to make it seem that the Court categorically ruled out evidence of other market participants.  See (Dkt. # 266 at 5).  In the paragraph preceding the one Plaintiffs quote, however, the Court stated:

> Gleason relied on Karani's opinion that "the ability to perform heavy-duty work is a key driver behind customer demand."  Therefore, Gleason, based on his conversations with Allied management and Karani, understood the relevant market, for heavy-duty use tools, to be exclusively Allied and Genesis.  Defendants' expert report finds that Genesis has many competitors, primarily LaBounty, but Gleason's determination that the relevant market was limited to Plaintiffs and Defendants also finds support in the record.  For example, Michael Ramun states in his deposition that Allied-Gator has several competitors, including LaBounty, Genesis, Atlas-Copo, Caterpillar, and A-Ward, but that Genesis is Allied's primary competitor.  Also Plaintiffs argued at the Daubert Hearing that Genesis's own marketing boasts that the Genesis LXP is revolutionary in its retention of its own pivot group, making it significantly different from other multiprocessors on the market.  *The relevant market is, therefore, a contested fact, and it would be inappropriate for this Court to choose which side to believe.*

(Dkt. # 169 at 6-7) (citations omitted) (emphasis added).

At the end of the same paragraph cited by Plaintiffs, the Court specifically stated that Defendants would have the opportunity to present their evidence as to the relevant market, stating:

> Similarly, the damages in the instant trade secrets case are uncertain.  If the Defendants disagree with Gleason's testimony, they may use traditional

> means to attack it, such as cross-examination at trial or putting on their own
> expert to point out the weaknesses in his report.

(Dkt. # 169 at 7-8).  Moreover, in the excerpt cited by Plaintiffs, the Court simply stated the required analysis for lost profits in a patent case and noted that the same analysis is not required in a trade secrets case.  In no way, however, did the Court rule that evidence which is aimed at defining the market for the products at issue in a trade secrets case was irrelevant.  Plaintiffs' attack on the admission of such evidence is without merit and does not warrant a new trial.

Plaintiffs also argue that the Court's instruction to the jury and verdict form on the issue of lost profits was erroneous and prejudicial.  According to Plaintiffs, the instruction and verdict form "require[d] Allied to prove, and the jury to find, that if the LXP and Versi-Pro were not in the market, Allied would have received every one of the sales that went to Defendants."  (Dkt. # 266 at 7).  This is simply not the case.  The Court's instruction to the jury on lost profits was as follows:

> "Actual loss" means Allied's lost profits.  Damages on the basis of lost profits may not be remote, uncertain, or speculative in nature.  On the other hand, damages do not need to be certain; once the fact of some damages have been shown, Allied need only prove its damages with reasonable certainty; however, it must show substantial evidence to permit you to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages.
>
> Allied claims it lost sales, and therefore, lost profits because the LXP and the Versi Pro were in the market.  Allied contends that every customer of an LXP or Versi Pro would have purchased an Allied MT, if the LXP and the Versi Pro were not in the market.
>
> Defendants contend that there are many competitors of Allied and Genesis, and that customers of the LXP or Versi Pro might have purchased a product of any number of other competitors, depending on the specific needs of the customer, and would not necessarily have purchased an Allied MT if the LXP and Versi Pro were not in the market.

37

(Dkt. # 240, Trial Tr. Vol. 9, p. 1680).  Thus, it is clear that the Court properly instructed the jury as to the definition of "actual loss/lost profits" and then laid out each party's position on the issue.  At no time did the Court instruct the jury that it had to adopt one theory to the exclusion of the other, or that lost profits damages were "all or nothing."

Plaintiffs aggressively presented their theory of a two-competitor market throughout trial.  As Defendants note, Allied presented no evidence which would have allowed the jury to calculate its lost profits based upon anything other than a two-competitor market.  During opening statements, counsel for Plaintiffs stated:

> One aspect of damages will become central, because it is yet another of the defenses that Genesis raises, and I want to focus on that one damage aspect.
> You will hear questioning about whether or not this is a multi-player market or a two-player market.
> Allied contends that the market for these multi-processors is a two-player market.  It doesn't need to prove that, but it will contend and establish it was.
> There were only two parties, Allied and Genesis, that have the features at issue in this case.  It distinguishes them from the rest of the industry.  And the definition of the market is important.
> Does Allied compete with numerous manufacturers?  Of course they do.  Does Allied compete with even dedicated shears?  Of course they do.  But the definition of the market is important.  Mercedes competes with Volkswagen, because they are both cars.  But a Volkswagen is not a luxury car.  Mercedes competes in the luxury car market.  The LXP and the MT compete in a league of their own, such that we will establish that had Genesis not been in the market, had Genesis not been offering a competing tool, Allied would have made these sales.
> We will show, we believe, that the evidence is that Genesis agrees with us.  In touting, before this case and to the world, that their shears, their LXP was revolutionary and unique, they are acknowledging that this is a two-player market.

(Dkt. #224, Trial Tr. Vol. 1, p. 27-28).

38

Furthermore, Plaintiffs' damages expert, Mark Gleason, testified to a two-player market and made his lost profits calculations accordingly.  See (Dkt. # 232, Trial Tr. Vol 6, p. 1044).  Finally, in his closing argument, Plaintiffs' counsel told the jury, with respect to lost profits:

> Damage, they have admitted it.  They have admitted to the world for the past five years: "Our tool is revolutionary and unique."  They tell that to the world.  Don't listen when they try to tell you a different story.  We are just one of 40 competitors.   You can buy our tool; you can buy their tool. There are two players in this market.

See (Dkt. # 240, Trial Tr. Vol. 9, p. 1590).  Plaintiffs cannot now claim error in the Court's summary of their position for the jury.

Similarly, there was no error in the verdict form and interrogatory used by the Court with respect to lost profits.  Interrogatory 3 asked the following:

> If you unanimously find that the Defendants have misappropriated Allied's trade secrets, has Allied proven by a preponderance of the evidence that customers who bought a Genesis LXP or Versi-Pro would have bought an Allied MT?  Please state yes or no on the blank provided.

(Dkt. # 242 at 4).[4]  The jury was further instructed that if their answer was "yes," they must then "state the amount of lost profits proximately caused by the defendants' misappropriation of Allied's trade secrets on the blank provided."  (Dkt. # 242 at 4).

Nothing in the Court's jury instructions or verdict form, can fairly be read to indicate to the jury that, in order to award any damages for lost profits, it was required

---

[4]     On the Interrogatory 3 form completed by the jury, the blank for "Yes" is marked with an X, which is crossed out and initialed by all jurors.  The blank for "No" is marked with a clear X.  Plaintiffs argue that, based upon such markings, "the jury's confusion regarding the issue of trade secret causation and the damages extending from the misappropriation is readily apparent."  (Dkt. # 265 at 8-9).  Plaintiffs' assertion is unfounded and speculative.  A jury may change its mind during deliberations.  Such changes are not necessarily indicative of confusion.

find that every sale of an LXP or Versi Pro would have gone to Allied.  The jury was free to weigh the parties' theories as to the relevant market and fashion lost profits damages accordingly.  The fact that the jury found Plaintiffs' evidence lacking with respect to lost profits does not render its verdict "seriously erroneous," so as to warrant a new trial on the issue.

### B.      Exclusion of Mark Ramun from Punitive Damages Instruction

Plaintiffs next argue that the Court erred in omitting Mark Ramun from its instruction to the jury on the issue of punitive damages.  They present the following account of the facts surrounding the crafting of the Court's instruction:

> [After the jury returned its liability verdict in favor of Plaintiffs,] [t]he Court then presented counsel with its proposed instruction on punitive damages and the proposed verdict form regarding punitive damages; Mark Ramun's name was included on both.  That same day, when discussing the punitive damage instruction and jury interrogatory in chambers, defense counsel voiced their objection to having but one line for all Genesis entities and requested that they be differentiated, but expressed no concern or objection with the inclusion of Mark Ramun on the verdict form.  The following Tuesday morning, however, defense counsel came armed with a new set of complaints.  Over Allied's objection, the Court removed Mark Ramun's name from both the punitive damages charge and the verdict form.
>
> The question of punitive damages was then submitted to the jury after brief statements of counsel, and the reading by the Court of the punitive damages charge and jury interrogatory—all of which omitted any reference to Mark Ramun.  The jury returned, shortly thereafter, with a finding of no liability for punitive damages.
>
> The Court gave no explanation for its decision to insulate Mark Ramun from the punitive damages determination in chambers or on the record.  Regardless, the decision was clear error and Allied was prejudiced by it; thus Allied is entitled to a limited new trial on punitive damages.

(Dkt. # 266 at 10-11).

40

Plaintiffs' account is inaccurate and misleading.  They neglect to discuss the representations made to the Court by Plaintiffs' counsel during a July 6, 2010, conference in chambers regarding the punitive damage instruction.  At that time, in response to Defendants' objection to the instruction, Plaintiffs' Attorney Christopher Opalinski advised the Court that Plaintiffs were not truly seeking punitive damages against Mark Ramun, but did seek such damages from Genesis.  Based upon this representation, the Court advised counsel that Mark Ramun would not be included in the punitive damage instruction.  Plaintiffs' counsel then made a non-specific and somewhat out-of-context objection to the omission on the record, but offered no specific objection when counsel for Mark Ramun confirmed, prior to the giving of the instruction, that Mark Ramun would not be included in the instruction.  (Dkt. # 241, Trial Tr. Vol. 10, pp. 1703, 1706).

At a subsequent conference in chambers following the August 24, 2010, permanent injunction hearing, Plaintiffs' Attorney Timothy Grieco confirmed the discussion from the July 6 in-chambers discussion, recalling that Attorney Opalinski advised the Court that Plaintiffs wanted only a "nominal" punitive damage award from Mark Ramun of, perhaps, ten dollars.

Despite these events, which should have clearly advised Plaintiff as to why Mark Ramun was removed from the punitive damage instruction, Plaintiffs now assert in their Motion for New Trial that "[t]he Court gave no explanation for its decision to insulate Mark Ramun from the punitive damages determination in chambers or on the record." (Dkt. # 266 at 11).  For Attorney Opalinski, as an officer of the Court, to omit key facts regarding the omission of Mark Ramun, to explicitly state that the Court offered no

41

explanation in chambers for such omission, and to feign surprise or a lack of understanding at the final version of the instruction is, at best, disingenuous and borders on sanctionable.

Mark Ramun was removed from the instruction on punitive damages because Plaintiffs' counsel represented to the Court that Plaintiffs did not really want such damages from Mark Ramun.  Whatever the reasons for Plaintiffs' inclination against true punitive damages for Mark Ramun, counsel may not now argue for a new trial by attempting to gloss over such representations.  As should have been clear to counsel at the time, the Court would not instruct the jury with respect to punitive damages against Mark Ramun, knowing that Plaintiffs wanted only a "nominal" amount from him.  First, the Court is unaware of any authority supporting such an award.  Moreover, a nominal figure is entirely inconsistent with the purpose of punitive damages, which is "to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct."  City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 266-67 (1981).  An award of ten dollars, as Attorney Grieco subsequently suggested, would serve neither of these goals.

Additionally, any argument by Plaintiffs that the omission of Mark Ramun "emasculated Allied's punitive damage claim and confused the jury" is without merit.  First, any award of punitive damages against Genesis must be based upon its own conduct, not that of Mark Ramun.  The Court properly instructed the jury as follows:

> You are not required to award punitive damages to Allied, and you may not do so unless you find that Allied has met its burden to prove by

clear and convincing evidence that Genesis knowingly authorized or participated in the actions of Mark Ramun, that demonstrate malice.

In order to award punitive damages, you must find by clear and convincing evidence that Genesis's misappropriation was both willful and malicious.

(Dkt. # 241, Trial Tr. Vol. 10, pp. 1707-08).  Because Genesis could not be held liable for punitive damages based solely on Mark Ramun's conduct, any prejudice to Plaintiffs' punitive damages claim against Genesis was minimal.

Therefore, Plaintiffs are not entitled to a new trial based upon the omission of Mark Ramun from the Court's instruction to the jury on the issue of punitive damages.

## C.  Miscellaneous Rulings

Plaintiffs finally contend that various evidentiary and legal rulings by the Court erroneously precluded them from presenting evidence of Genesis' alleged malicious and willful conduct.

### 1.  *David Palvere Deposition Testimony*

First, Plaintiffs argue that the Court improperly excluded deposition testimony of David Palvere, Genesis' Director of Business Development.  According to the proffered testimony, Palvere approached Bruce Bacon regarding the ethics of hiring Mark Ramun because Mark was now "competing against his family already in the marketplace and trying to sell his products through another company."  (Dkt. # 239, Trial Tr. Vol. 8, pp. 1529).  Plaintiffs contend that this testimony was admissible as evidence of "Genesis's state of mind in deciding whether their misappropriation was willful and malicious, and thus, whether Allied was entitled to punitive damages," and also as impeachment

43

evidence against Bacon.  (Dkt. # 266 at 14).  Defendants respond that the testimony was inadmissible on either ground.

Palvere's deposition testimony was properly excluded.  First, its potential prejudicial impact outweighed its probative value on the issue of misappropriation.  By Allied's own admission, the testimony was not probative of whether Mark misappropriated trade secrets or whether Genesis' acted willfully or maliciously specifically with respect to any such misappropriation.  Rather, Palvere testified that he expressed concern regarding the hiring of Mark in general because, based upon his connection to Allied, it "just didn't seem very ethical."  (Dkt. # 239, Trial Tr. Vol. 8, p. 1529).  The obvious implication of such testimony is that Mark was an unethical person and that Genesis acted improperly simply by hiring him.  This is highly prejudicial testimony with only slight, if any, probative value as to Bacon or Genesis' state of mind specifically with respect to misappropriation of Allied's trade secrets.

The testimony was also not properly admissible for impeachment purposes against Bacon.  Despite their contention, Palvere's testimony did not directly contradict Bacon's testimony.  Counsel for Plaintiffs asked Bacon on cross-examination whether he knew that "the sales and engineering department did not want [Bacon] to hire Mark."  (Dkt. # 236, Trial Tr. Vol. 7, pp. 1234-35).  Bacon stated that he did not know this prior to hiring Mark.  Plaintiffs' counsel then asked whether Bacon knew after Mark was hired that "certain people within the engineering department didn't even want to work with [Mark]."  (Dkt. # 236, Trial Tr. Vol. 7, p. 1235).  Bacon confirmed that he knew that.  Counsel then asked Bacon whether Dan Jacobson, head of engineering at Genesis,

disliked working with Mark.  (Dkt. # 236, Trial Tr. Vol. 7, p. 1235).  Bacon confirmed that, after a time, Jacobson did not want to work with Mark.  Counsel never asked about, and Bacon never denied, Palvere's specific concerns over Mark's hiring.  Nor did counsel ask when such concerns were allegedly presented to Bacon.  Counsel's general question as to whether "the sales and engineering department" did not want Mark hired was insufficient to render Palvere's deposition testimony admissible to impeach Bacon. Palvere, the Director of Business Development, was not "the sales and engineering department" of Genesis.  Thus, there was no basis to admit Palvere's deposition testimony for impeachment purposes.

### 2.    *Richard Currie Deposition Testimony*

Plaintiffs next argue that the Court improperly excluded the deposition testimony of Richard Currie.  Specifically, Plaintiffs assert, "Despite ruling that his testimony [was] admissible, however, the Court excluded this corroborating testimony as cumulative." (Dkt. # 266 at 15).  Plaintiffs fail to note, however, that this testimony was, in fact, admitted except for certain excised portions.  (Dkt. # 231, Trial Tr. Vol. 5, p. 761). Plaintiffs chose not to use the admitted portions.

With respect to the excised portions of the Currie deposition, the Court determined that such testimony was needlessly cumulative of Mark Ramun's state of mind, evidence of which was already admitted in the form of Simon Ward's deposition testimony.  (Dkt. # 231, Trial Tr. Vol. 5, pp. 760-61).  Aside from stating that Currie's testimony "substantiates the deposition testimony of Simon Ward and further supports that Mark Ramun's actions were knowing and intentional," Plaintiffs do not give any grounds for

45

the Court to revisit its ruling that the testimony was needlessly cumulative on the issue. Moreover, Plaintiffs do not provide any argument as to how the excision of part of Currie's deposition regarding Mark Ramun's state of mind prejudiced them in their pursuit of punitive damages against Genesis. Thus, the Court finds no error in the excision of portions of the Currie deposition.

### 3.    *The Stanley-LaBounty Litigation*

Next, Plaintiffs allege error in the Court's exclusion of evidence of a prior trade secrets litigation between Genesis and competitor Stanley-LaBounty ("Stanley"). Plaintiffs contend that the litigation was relevant because "it involved a suit filed by a competing manufacturer against Genesis to protect a trade secret that was also a key element of Allied's asserted trade secrets." (Dkt. # 276 at 16). Defendants argue that evidence of the litigation was properly excluded because it was irrelevant to the facts of the specific case then being tried to the jury.

The Stanley litigation ended in a settlement between Genesis and Stanley with no admission of liability by Genesis. Plaintiffs claim that they sought to present this evidence to show Genesis' motive, knowledge, and intent to misappropriate Allied's trade secrets. (Dkt. # 266 at 16). Plaintiffs also argue that the fact that Stanley alleged a trade secret in its use of a shrink fit is evidence that "Genesis had been put on notice by another industry manufacturer…that Stanley considered the shrink fit to be worthy of [trade secret] protection." (Dkt. # 266 at 16). Evidence of the prior litigation is not probative, however, on any of these grounds. That is, Plaintiffs cannot show that Genesis acted willfully and maliciously in misappropriating Allied's trade secrets by presenting

46

evidence that another competitor felt Genesis had misappropriated its trade secrets.  Nor is it relevant that Stanley considered its own use of a shrink fit to be a trade secret.  Based upon the proffered evidence, there was never a finding that Stanley possessed a trade secret, shrink fit or otherwise, or that Genesis misappropriated any such secret.  Thus, any evidence regarding the Stanley litigation would have been aimed primarily at inferring that Genesis engaged in chronic misappropriation, with the implication being that Genesis acted willfully and maliciously in the instant matter.  The evidence was, therefore, properly excluded both under Rule 403 and 404(b).

### 4.    *Ramun Family Relations*

Plaintiffs also argue that evidence and argument by counsel regarding the relations between members of the Ramun family, and particularly the relationship between Mark Ramun and his father, Plaintiff John Ramun, was improperly admitted in violation of the Court's ruling on Plaintiffs' Motion in Limine to exclude such evidence.  According to Plaintiffs, such evidence was irrelevant and prejudicial, and unfairly influenced the jury's verdict on the issue of punitive damages.  Defendants argue that this evidence was relevant as to Mark's credibility, the reasons Mark left Allied, and whether he misappropriated any Allied trade secrets.

While the Court recognizes that irrelevant and gratuitous information regarding the personal relationships between the parties is inappropriate and may result in prejudice warranting a new trial, this is not the case in the instant matter.  As the Court noted at trial, Plaintiffs overstate both the scope and impact of information presented at trial regarding the Ramun family.  See (Dkt. # 230, Trial Tr. Vol. 4, pp. 714-15).  In a case

such as the instant matter, in which a father and son are opposing parties in litigation over matters concerning the family business, it is virtually inevitable that some amount of information regarding family relations will be introduced.  Indeed, the complete absence of any such background information in the instant matter would likely have led to jury confusion, and perhaps speculation, over the facts of the case.

Moreover, evidence of Mark Ramun's interactions with his father, John Ramun, was highly relevant to his defense.  Plaintiffs' misappropriation case was based upon confidential information Mark possessed on his computer at the time he left Allied, which Plaintiffs alleged he took in order to shop it around to other companies and find "a willing buyer."  See (Dkt. # 240, Trial Tr. Vol. 9, p. 1602).  Mark's explanation for taking the information was that, upon abruptly deciding to leave Allied after a falling out with his father, he "panicked" because his "whole world had just turned upside down," and backed up his computer.  (Dkt. # 230, Trial Tr. Vol. 4, pp. 694-96).  As the Court ruled in allowing Mark's testimony on the issue, the circumstances surrounding his departure from Allied and taking the information are closely linked to evidence of Mark's relationship with his father.  See (Dkt. # 230, Trial Tr. Vol. 4, pp. 688-89).  Weighing the relevance and centrality of such evidence to Mark's defense against any prejudice it might have caused to Plaintiff John Ramun, the court finds no error in admitting such evidence.

The majority of additional references to the Ramun family were based upon Mark's testimony on the subject.  Based upon a review of the record, the Court finds that these references, even if inappropriate in some instances, were not so prejudicial as to

have biased the jury and compromised its verdict on punitive damages.  Based upon the evidence presented at trial and counsel's arguments at the punitive damages phase, it cannot be said that the jury reached a "seriously erroneous result" that would necessitate a new trial.

### 5.    *Spoliation of Evidence Instruction*

Plaintiffs finally argue that the Court erred in failing to instruct the jury regarding spoliation of evidence during the punitive damages phase of the trial.  Specifically, Plaintiffs contend that the Court should have informed the jury "that it was fully within its province to draw a negative inference from the disappearance of Mark Ramun's laptop, Genesis's deletion of backup servers and hard drives, and Mark Ramun's intentional, calculated destruction of evidence."  (Dkt. # 266 at 20).  Defendants respond that Plaintiffs were not entitled to a spoliation instruction because they never raised the issue of spoliation prior to their proposed jury instruction, no evidence was actually destroyed, and Plaintiffs had a full opportunity to present any evidence of spoliation to the jury.

The Court finds that no spoliation instruction was necessary and that Plaintiffs were not prejudiced by the lack of such an instruction.  The evidence of Defendants' deletion of information was fully presented to the jury.  During his closing argument in the liability phase of the trial, Plaintiffs' counsel specifically addressed the issue:

> And finally, in terms of circumstantial evidence of a misappropriation, the destruction of evidence.  If you don't do anything wrong, there's no need to cover up your trail.  You don't panic.  You don't destroy evidence.  And you don't even then destroy the evidence

49

destruction program. He wanted to obliterate every trace of information that could be tied back to him.

And he did a pretty good job. We have no idea what was on his computer that has been deleted, and we will never know. But they should not get the benefit of that destruction of evidence.

You also heard evidence that beyond that destruction, there's a laptop in the key time period, '03 to '05, that was never produced. Disappeared. Couldn't find it.

What did you hear during this trial? "Well, we gave you the backup tapes. It's all on the backup tapes."

What did Mr. Jacobson admit yesterday under Mr. Grieco's cross-examination? "I never even looked for e-mails, just drawings."

And did you hear evidence of the reformatting of the various of the computers within Genesis?

And, in fact, since Mark worked at a distant location, his e-mails were not even on the server to be backed up.

(Dkt. # 240, Trial Tr. Vol. 9, pp. 1608-09).

Having heard each side's theory as to Defendants' motives for deleting the information, the jury was fully capable of drawing its own inferences on the issue without a specific instruction from the Court. See West v. Tyson Foods, Inc., 374 F. App'x 624, 635 (6th Cir. 2010) (court did not err in giving a permissive spoliation instruction because "the instruction was simply a formalization of what the jurors would be entitled to do even in the absence of a specific instruction. Therefore, even if the district court had not given the instruction…the jury's discretion would not have been affected in any way."). Accordingly, Plaintiffs were clearly not prejudice by the lack of a spoliation instruction in their attempt to obtain a punitive damage award.

### D.     Conclusion

For the foregoing reasons, the Court finds that Plaintiffs are not entitled to a new trial based upon the grounds asserted, either individually or collectively, in their Motion

for New Trial on Lost Profits and Punitive Damages.  Therefore, Plaintiffs' Motion for New Trial is hereby **DENIED**.  (Dkt. # 265).

### III.    PLAINTIFFS' MOTION FOR ATTORNEYS' FEES

Plaintiffs have also filed a Motion to Mold Verdict for Attorneys' Fees.  (Dkt. # 252).  The Ohio Uniform Trade Secrets Act provides, in pertinent part:

> The court may award reasonable attorney's fees to the prevailing party, if any of the following applies:
>
> (A) A claim of misappropriation is made in bad faith.
>
> (B) A motion to terminate an injunction is made or resisted in bad faith.
>
> (C) Willful and malicious misappropriation exists.

O.R.C. § 1333.64.  In the instant matter, only subsection (C) provides any basis for awarding attorneys' fees.

As Defendants point out, the finding required for an award of attorneys' fees under § 1333.64(C) mirrors that required for an award of punitive damages under § 1333.63(B). Both sections mandate a finding of "willful and malicious misappropriation." <u>See</u> O.R.C. §§ 1333.63(B) and 1333.63(C).  Plaintiffs' attempts to distinguish the two are unclear and illogical.[5]  While the question of attorneys' fees is one for the Court, whereas a jury may determine a punitive damage award, the finding required for each is the same.

The question of whether attorneys' fees are appropriate is left to the discretion of the Court.  <u>See</u> O.R.C. § 1333.64.  Based upon the jury's verdict with respect to punitive damages, and taking into account all of the evidence presented, the Court finds that

---

[5]        In their Motion, Plaintiffs assert, "Although the jury found that Genesis was not liable for punitive damages, in so doing the jury did not specifically determine the separate issue of whether or not Genesis's misappropriation was willful and/or malicious, which is an issue for the Court."  (Dkt. # 252 at 1-2).

Plaintiffs have failed to show that Defendants acted willfully and maliciously in misappropriating Allied's trade secrets.  Therefore, Plaintiffs' Motion to Mold Verdict for Attorneys' Fees is hereby **DENIED**.  (Dkt. # 252).

## IV.    PLAINTIFFS' MOTION FOR PREJUDGMENT INTEREST

Finally, Plaintiffs have moved for an award of prejudgment interest pursuant to O.R.C. § 1343.03(C).  (Dkt. # 254).  Plaintiffs contend that Defendants failed to make a good faith effort to settle the instant matter prior to trial.  Defendants argue that because Plaintiffs failed to demonstrate their own good faith effort at settlement, they are not entitled to an award of prejudgment interest.

As an initial matter, the Court notes that, because Defendants' Motion for Judgment as a Matter of Law has been granted with respect to the jury's award of unjust enrichment damages, Plaintiffs are not entitled to prejudgment interest, as there is no longer any judgment for the payment of money by Defendants.  <u>See</u> O.R.C. § 1343.03(C)(1).  Nevertheless, the Court will address the substance of Plaintiffs' motion in the event the Court's JMOL ruling is disturbed on appeal.

Decisions regarding an award of prejudgment interest are within the sound discretion of the trial court.  <u>Huffman v. Hair Surgeon, Inc.</u>, 482 N.E.2d 1248, 1251 (Ohio 1985).  In order to find that a prevailing party is entitled to prejudgment interest on an award for tortious conduct, the court must find that "the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the

money is to be paid did not fail to make a good faith effort to settle the case."[6]  O.R.C.

§ 1343.03(C).  The Ohio Supreme Court has held:

> A party has not "failed to make a good faith effort to settle" under [O.R.C.
> § 1343.03(C)] if he has (1) fully cooperated in discovery proceeding, (2)
> rationally evaluated his risks and potential liability, (3) not attempted to
> unnecessarily delay any of the proceedings, and (4) made a good faith
> monetary settlement offer or responded in good faith to an offer from the
> other party.

Kalain v. Smith, 495 N.E.2d 572, 574 (Ohio 1986).  If either party has failed to comply

with any one of these factors, it has failed to make a good faith effort to settle.  Szitas v.

Hill, 846 N.E.2d 919, 922-23 (Ohio App. 8 Dist. 2006).

It has been the Court's experience over the course of the instant litigation that the

parties have been mutually aggressive and uncooperative.  Plaintiffs and Defendants have

equally held fast to their respective positions on both liability and damages, and have

refused to make any significant concessions to the opposing party on either issue.

Despite the Court's diligent efforts at encouraging settlement, no resolution was able to

be reached prior to trial.  It cannot be said, however, that Defendants unilaterally failed to

make a good faith effort at settlement, such that Plaintiffs are entitled to prejudgment

interest.

Though discovery was a contentious and difficult process, no party was so

uncooperative as to be guilty of a lack of good faith.  The nature of the litigation, the

quantity of discovery material, and the sensitive nature of many of the documents at issue

made it important to all parties that disclosure of such information was appropriate and

---

[6]     Plaintiffs' attempt to exempt their own conduct from scrutiny under § 1343.03(C) is unclear and
unavailing.  By the very language of the statute, the prevailing party is not entitled to prejudgment interest
if it failed to make a good faith effort at settlement.

warranted.  Under the circumstances, it was not a lack of good faith on the part of any one party that complicated the discovery process.

Likewise, none of the parties attempted to unnecessarily delay any of the proceedings.  The protracted nature of the litigation was due more to the extensive discovery and significant motion practice than to the conduct of any of the parties.

In the Court's opinion, one of the major impediments to settlement was Plaintiff John Ramun.  At a settlement conference before the Court more than two years prior to trial, John Ramun indicated a disinclination to settlement because, as he stated, he simply wanted to tell his story to a jury.  Nothing that occurred through the remaining course of the litigation suggested to the Court that his attitude towards settlement changed significantly.

Moreover, neither party made any specific monetary settlement offer until after the Court's summary judgment ruling in August 2009.  Plaintiffs' initial demand was for the entirety of their alleged lost profits of almost $9 million and for Genesis to cease selling the LXP and Versi Pro.  Defendants' initial offer of $1.1 million was lower than they could have expected Plaintiffs would accept, though perhaps not unreasonable as a starting point for negotiations.  Plaintiffs held fast to their initial demand, a position that remained unchanged even at a conference before the Court a few weeks prior to trial.  Defendants, in turn, did not increase their offer until immediately prior to trial, though they never offered to stop making the offending products.

Thus, neither party truly "rationally evaluated his risks and potential liability," or "made a good faith monetary settlement offer or responded in good faith to an offer from the other party," as required by <u>Kalain</u>.  Thus, even assuming Plaintiffs could have shown that Defendants failed to make a good faith effort to settle the case, they have failed to show a good faith effort of their own.  Under O.R.C. § 1343.03(C), therefore, Plaintiffs are not entitled to prejudgment interest in the event that the jury's award is reinstated on appeal.

For the foregoing reasons, Plaintiffs' Motion for Prejudgment Interest is hereby **DENIED**.  (Dkt. # 254).

## V.     CONCLUSION

Based upon the foregoing, the Court hereby orders that:

(1)     Defendants' Motion for Judgment as a Matter of Law is **GRANTED** with respect to the jury's award of unjust enrichment damages, and **DENIED** on the issue of liability for misappropriation, (Dkt. # 264);

(2)     the jury's award of unjust enrichment damages to Plaintiffs in the amount of $3,046,800 is vacated;

(3)     Defendants' Alternative Motion for New Trial is **DENIED**, (Dkt. # 264);

(4)     Defendants' Motion to Stay Enforcement of Judgment is **DENIED as MOOT**, (Dkt. # 248);

(5)     Plaintiffs' Motion for New Trial on Lost Profits and Punitive Damages is **DENIED**, (Dkt. # 265);

(6)     Plaintiffs' Motion for Attorneys' Fees is **DENIED**, (Dkt. # 252);

(7)     Plaintiffs' Motion for Prejudgment Interest is **DENIED**, (Dkt. # 254).

      **IT IS SO ORDERED.**

**/s/ Peter C. Economus – November 19, 2010**
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**
